188 So.2d 272

**James William WRIGHT**

v.

**STATE.**

**7 Div. 696.**

Supreme Court of Alabama.

March 31, 1966.

Rehearing Denied July 14, 1966.

Richmond M. Flowers, Atty. Gen., and W. Mark Anderson, III, Asst. Atty. Gen., for the State.

HARWOOD, Justice.

Under an indictment charging murder in the first degree, this appellant's trial resulted in a verdict of murder in the second degree and his punishment was fixed at confinement in the penitentiary for thirty years.

The victim of the homicide was the appellant's wife.

The evidence introduced by the state in the trial below tends to show that the appellant and his late wife had been married about two and a half years. At the time of the killing they were living in a cottage at Camp Mac in Talladega County.

On Thanksgiving Eve 1965, the appellant and his wife had invited Mr. and Mrs. Hobart Miller to spend that night and Thanksgiving day with them, the ap-

Huel M. Love, Talladega, for appellant.

pellant and Mr. Miller having planned a hunting trip the next day.

The Millers arrived bringing with them a turkey which Mrs. Miller had already cooked. The appellant had apparently imbibed freely of vodka, and Mr. Miller of whiskey after the Miller's arrival. The two women had consumed some beer, though the deceased had drunk only one can of beer, or a part thereof.

During the evening the two couples were playing cards and Mrs. Wright left the game and went into an adjoining room. The appellant followed the deceased into the room and attempted to persuade her to return to the game but she refused. The Millers concluded that they should leave. The appellant walked to the Miller car with them, and upon his return to the house announced to his wife that he was going to walk to his mother's house to spend the night. Mrs. Wright had secreted his car keys, and refused to surrender them to the appellant. The appellant had on a shirt with sleeves rolled up, and it was a rather cold night.

After some argument with Mrs. Wright as to whether he would leave the house that night, the appellant obtained his pistol from a linen closet. During the struggle for this pistol it fired and a bullet entered Mrs. Wright's body just above the clavicle bone and emerged below at about the fifth rib. Her death resulted very quickly from this wound.

The appellant called his mother over the telephone and in turn the Sheriff's office was called.

The shooting apparently occurred around 10 or 10:30 at night. The Sheriff's office received the call around 11:45 P.M. Sheriff Brewer immediately drove to the scene as did Mr. Clinton Perkins, the coroner of Talladega County. Sheriff Brewer arrived at the scene at about 12:10 A.M., and the coroner shortly thereafter. Mr. and Mrs. Harvey Wright, parents of the ap-

pellant, and Deputy Freeman had also gone to the home earlier after they received the call from the appellant.

At the time the officers arrived at the scene they found the victim lying on the bed with her face covered by a blanket, and much blood was in evidence. The appellant was distraught, loud and boisterous, and in an intoxicated condition.

After a preliminary investigation, the appellant was placed under arrest and taken to the county jail in Talladega. Prior to being jailed he was interviewed by Sheriff Brewer in his office. This interview took place about 2 A.M. Sheriff Brewer testified that the appellant at this time had sobered up.

Sheriff Brewer testified that prior to interrogating the appellant he informed him that he had a right to remain silent and that he had the privilege of calling a lawyer. In this regard Sheriff Brewer testified:

"I said 'you have got that privilege to call a lawyer.' He said 'No. I'll leave that up to Daddy.' He says 'I'll let Daddy call the lawyer.' So I went ahead and got a statement."

As to this statement, Sheriff Brewer testified that the appellant told him that when he took his pistol from the linen closet he and his wife began to struggle over the possession of the pistol and that it discharged accidentally. The appellant illustrated the position of his wife and himself at the time the gun was fired, and according to Sheriff Brewer they were both standing up and the end of the pistol barrel was fourteen inches distant from the victim's body. This distance was measured by the Sheriff in accordance with the positions illustrated by the appellant. During this interview the appellant maintained that the shooting was accidental and made such statements as that he had rather been shot than his wife, etc.

The appellant also stated that on the occasion of a prior disagreement, his wife had hidden his pistol because she was afraid that he would shoot her; that when he returned to the house after accompanying the Millers to their car as they departed, he was as mad as he had ever been. During his first statement the appellant denied that he had pulled the trigger to the gun.

The next morning the appellant was again interviewed by Sheriff Brewer around 10:50 A.M. His statement at this time was substantially the same as the night before except he said he now remembered that he may have accidentally pulled the trigger one time.

Prior to this interview Sheriff Brewer testified that he again informed the appellant of his constitutional right to remain silent, and further that no reward or hope of reward, and no coercion had been exercised toward the appellant.

Later that day, about 6:45 P.M., the appellant was interviewed by Mr. Robert J. Johnson an assistant toxicologist, who had by then performed an autopsy on the body of the deceased. Mr. Johnson testified that at the time of his interview the appellant was told that he could have Mr. Love, who Mr. Johnson understood was appellant's attorney, present if he so desired but the appellant replied that he did not wish to have Mr. Love present, and was also told he could remain silent if he wished. The appellant again gave a statement substantially the same as the second statement he had given to Sheriff Brewer, and again illustrated the position of his wife and himself at the time the gun was fired.

Mr. Johnson performed powder burn experiments with the appellant's pistol. In these firing tests Mr. Johnson used the same type of ammunition as the empty shell that was found in the pistol after the shooting. These tests showed that the pistol, when fired with this type of shell, would produce powder burns definitely at a distance of twenty inches. There were three bullet holes in the blouse which the deceased was wearing at the time she was shot but these bullet holes resulted from creases in the blouse and not from multiple bullets. Microscopic and chemical examination of the blouse by Mr. Johnson failed to show any powder burns on the blouse.

The appellant did not testify in the trial below, but did introduce a number of character witnesses.

In rebuttal the state introduced as a witness Mrs. Mary Ponder. Mrs. Ponder testified that she and the victim had been to a football game in Auburn some eleven days before the killing. Returning from the game they stopped by the Wright's home where the appellant joined them and the trio then drove to the Miller's home in Anniston. Mr. and Mrs. Miller had had an argument and she was leaving the house as they arrived. They went in. Shortly, Mr. Miller went in search of Mrs. Miller. The appellant came into the room where Mrs. Wright and Mary Ponder were and began to choke his wife. According to Mrs. Ponder, Mrs. Wright began to gasp for breath and she undertook to pull the appellant's hands loose from his wife's neck. In this regard the record shows the following:

"Q Did you pull with all your might and all your strength to pull him loose from Patsy?

"A Yes.

"Q And did you eventually pull him loose from her?

"A No. He turned her loose.

"Q He turned her loose?

"A Yes.

"Q When he turned her loose what did he do next if anything?

"A He grabbed hold of me and crushed my chest.

"MR. LOVE: I object to that if it please the Court.

"Q Let me ask this—

"THE COURT: All right, we will exclude the word 'crushed'.

"Q Do you know of your own personal knowledge whether upon that occasion that you had a rib that was fractured?

"MR. LOVE: I object to that.

"THE COURT: Yes or no, I'll overrule.

"MR. LOVE: We except.

"A Yes.

"Q Was there an X-ray later taken of that injury?

"A Yes.

"MR. LOVE: If it please the Court I object to that.

"THE COURT: I'll overrule.

"MR. LOVE: Except.

"Q Is that X-ray now in the possession of Dr. Toole the medical doctor?

"A Yes.

"MR. LOVE: I object to that. Move to exclude it.

"THE COURT: I'll overrule.

"MR. LOVE: We except."

In the trial below the state introduced as witnesses Mr. and Mrs. Harvey Wright, parents of the appellant. The portions of their testimony, material to this review occurred during their voir dire examination in connection with the introduction of the statements made by the appellant. We note here that all voir dire examinations, including those going to the voluntariness of appellant's statements, were had outside the presence of the jury.

Mr. Wright testified that after the appellant had been taken to Sheriff Brewer's automobile he was placed in the back seat. He and Mrs. Wright went to the automobile. Sheriff Brewer was sitting under the steering wheel. Mr. Wright asked if he could see his son the next morning. Then, according to Mr. Wright:

"He said, 'Yes, sir. You can see him in the morning. Come on down.' And my wife was standing by the side of me and Perkins was standing behind her. And I says, 'Son, I'll be down in the morning and see you and I'll get a lawyer.' And Perkins put his hand up on my wife's shoulder and says, 'Honey, y'all ain't got a thing in the world to worry about. You don't need no lawyer' and Luke says, 'No, y'all ain't got a thing in the world to worry about. Y'all don't need no lawyer.' So I didn't get any contact, or try to get in contact with no lawyer that night."

On her voir dire examination Mrs. Harvey Wright testified that just before they left the appellant's home her husband told the appellant that he would be down in the morning and get a lawyer and that Mr. Brewer and Mr. Perkins stated:

"There is no need of that Harvey, don't get no lawyer, Harvey, because you don't need one."

Mrs. Wright further testified that at this time Clinton Perkins patted her on the shoulder and told her, "Honey, don't worry. You haven't a thing in the world to worry about."

According to Mrs. Wright, Sheriff Brewer also made the same statement to her. These statements were made in her presence and the presence of Mr. Wright, her husband, and the appellant.

In rebuttal of this testimony, Sheriff Brewer denied that either Clinton Perkins or he had made the statements attributed to them by Mr. and Mrs. Wright.

Mr. Harvey Wright also testified that the next morning he went to the jail to see his son, but was told by the jailer he could

not. He returned to his home and between 9 and 10 A. M., Sheriff Brewer called him and told him to return and he could see his son. Mr. Wright returned to the jail and did see his son.

Sheriff Brewer was not present when Mr. Wright first came to the jail, and upon learning that Mr. Wright had been there and had been told he could not see his son at that time, Sheriff Brewer called Mr. Wright and told him to return. The Wrights had just walked in their home when they received the call from Sheriff Brewer. The inference is that Mr. Wright saw his son during the morning, but the record is not clear as to the exact time.

In connection with Mary Ponder's testimony, the record shows that the solicitor stated he had Dr. Toole as a witness but that he would excuse him and would close the testimony if the defense would close its testimony. At this time the attorney for the defense stated that he would use Dr. Toole as a witness.

As a witness for the defense, Dr. Toole testified that he made X-rays of Mary Ponder's chest on 24 March 1965. At this time she mentioned having a pain in her chest for three or four days. She gave no history that she had had a rib fractured the prior November. The X-rays disclosed an old fracture of a rib. Dr. Toole further testified that under ordinary circumstances a fracture of a rib is painful upon breathing.

In rebuttal to this testimony, Mary Ponder testified that her rib had given her trouble off and on from the time she was squeezed by the appellant in November until she consulted Dr. Toole the following March.

Counsel for appellant argues that the court erred in admitting, over appellant's objections, the statements made by the appellant when interrogated by Sheriff Brewer, and later by Mr. Johnson. Counsel largely relies upon Escobedo v. State of

Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, to support his argument as to this point.

In Duncan v. State, 278 Ala. 145, 176 So. 2d 840, Justice Lawson reviewed in detail the interpretation of *Escobedo* by various courts, both state and federal. In *Escobedo,* supra, the facts showed that after his arrest the accused had repeatedly requested to be permitted to consult his attorney, and the accused's counsel had visited the jail and requested to see Escobedo. All such requests were denied.

We will not again cite or comment upon the large number of authorities set forth in *Duncan,* supra, but again observe as we did in Tiner v. State, Ala., 182 So.2d 859,[1] that the effect of *Duncan* is to place the views of this court in accord with those jurisdictions whose conclusions are that the *Escobedo* doctrine, in the interest of realistic administration of criminal investigations not inconsistent with constitutionally guaranteed rights, should be limited to the facts of that case.

In the present case the accused was some 30 years of age, and maintained a separate home with his wife. Sheriff Brewer testified he was informed prior to any statement made by him of his right to remain silent, and that he could have counsel present. Mr. Johnson's testimony was to the same effect. The appellant replied that he would leave the matter of the lawyer to his father, and thereupon proceeded to give his version of the killing to Sheriff Brewer. No coercion or deprivation of counsel can be read into this predicate. Again, when interviewed by Mr. Johnson, the appellant was again informed of his right to remain silent, and to have present Mr. Love, who Mr. Johnson understood was appellant's counsel, and who did represent the appellant in the trial below. Appellant replied he did not wish to have Mr. Love present.

■ Under the facts we are not in accord with the argument of appellant's coun-

1. Ante p. 126.

sel that Sheriff Brewer's actions were a species of trickery to deprive the appellant of counsel while attempting to obtain a statement from him. On the other hand, we hold that under the totality of the facts the statements by the appellant were voluntarily made and were properly received in evidence. Actually, the statements by the appellant were not confessory of any unlawful killing, but were protestations of innocent conduct with the death of his wife resulting from an accidental discharge of the pistol during the struggle for its possession.

It is the evidence of physical facts presented by the state that tends to deny the appellant's statements, that is, the location of the entrance wound, the range of the bullet downward, and the absence of powder burns, when read in the light of the appellant's statements as to how the shooting occurred.

Counsel for appellant further argues that error resulted from the action of the court in permitting Sheriff Brewer, over appellant's objection, to relate that the appellant had stated during his interrogation by the Sheriff that he had left his deceased wife once before, and that on a prior occasion the deceased had hidden his gun because she was afraid he would shoot her.

Counsel contends that Onnie Kissic v. State, 266 Ala. 71, 94 So.2d 202, 67 A.L.R. 2d 530, prohibits the admission of these statements as hearsay. We hasten to observe that *Kissic* dealt with the admission of hearsay testimony contained in a recording played in the presence of the jury, purportedly to refresh the memory of a witness who had denied making any statement. This factual situation is so entirely different to the situation now presented as to render *Kissic* wholly inapplicable.

██ While these statements in the present case may have prejudiced the appellant in the eyes of the jury, yet, in criminal prosecutions the conduct and declarations of an accused on other occasions are relevant when they tend to shed light on his motives and intentions in doing the act complained of. Hall v. State, 208 Ala. 199, 94 So. 59. Particularly do these statements of the appellant in this prosecution tend to shed light upon whether the shooting was accidental, as contended by the appellant, or was intentional.

No error resulted in the court's rulings in this instance.

It is argued in the brief of appellant that the court erred in its rulings relative to the testimony of Mary Ponder which we have excerpted from the record and set out above.

It is to be noted that several of the objections were interposed after the witness had answered the question. However, a general objection was timely interposed to the question as to whether Mary Ponder knew of her own personal knowledge that she had a rib fractured upon the occasion of the assault upon her by the appellant, and there was a motion made to exclude her answer that Dr. Toole had in his possession the X-ray made of her chest.

We prefer to approach the question in its broader aspects rather than discussing whether the record was protected as to those questions to which the objections were tardily interposed after the witness had answered.

██ Clearly Mary Ponder's testimony as to the assault by the appellant upon the deceased was admissible, as going to show the animus and intent of the appellant at the time his wife was shot, and as to whether the shooting was an accident as the appellant claims. Our consideration of this point is rendered more difficult by virtue of the fact that a portion of Mary Ponder's testimony tends to show the difficulty between the appellant and Mary Ponder rather than a difficulty between the appellant and the deceased. It is our view, however, that the difficulty between Mary Ponder and the appellant was so interrelated with the difficulty between the appellant and the

deceased as to be concomitant part thereof. It is inferable that due to the strenuous efforts of Mary Ponder to break the grip of the appellant upon his wife's throat, the appellant upon releasing his grip upon his wife's throat, instantaneously grabbed Mary Ponder and began squeezing her to the extent, according to Mary Ponder, that she received a fractured rib. The general animus of the appellant toward his wife was apparently directed not only toward his wife, but also toward Mary Ponder because of her efforts to come to the rescue of the deceased.

■ In this aspect we are unwilling to hold that the court erred in its rulings permitting Mary Ponder's testimony as to the conduct of the appellant toward her on this occasion. In our consideration we have not overlooked the doctrine of our cases to the effect that former difficulties between an accused and a stranger to a case, which is in no wise a part of the res gestae of the case, is inadmissible. See Helms v. State, 34 Ala.App. 82, 37 So.2d 229. However, because of the intimate connection of Mary Ponder with the assault upon the deceased, we do not think it could be said that the actions of the appellant toward Mary Ponder upon the occasion in question were directed toward a stranger to this case.

The question yet remains as to whether the court erred in permitting Mary Ponder to testify that she received a fractured rib on this occasion and that she had had X-rays made.

As observed by Judge McElroy in his work on evidence (The Law of Evidence in Alabama, 2d Ed. Sec. 45.06(5)), the rule enunciated in McAnally v. State, 74 Ala. 9, to the effect that the gravity or lack of gravity of a former difficulty may be proven but that its merits or particulars cannot be shown nor can it be shown who was at fault in the former difficulty, present a rule difficult to administer and to comply with. As stated in Dodd v. State, 32 Ala. App. 504, 27 So.2d 259:

"The demarcation between the fact, or highlights, of a former difficulty, and its details, is indeed a tenuous and vague division. A measure of discretion should and must be allowed the trial judge in determining the extent of detailing necessary to picture and constitute the fact. Brothers v. State, 236 Ala. 448, 183 So. 433."

To the same effect see Spain v. State, 37 Ala.App. 311, 68 So.2d 53; Mahaley v. State, 36 Ala.App. 89, 53 So.2d 594.

We will not here attempt to review or reconcile the very large number of our cases and those of the Court of Appeals pertaining to whether the facts shown did or did not constitute an excess of detailing, but refer those interested to Judge McElroy's very detailed discussion of these cases to be found in his work above referred to in Section 45.06 et seq.

■ We are in accord with the views expressed in the opinions of the Court of Appeals in Dodd, Spain, and Mahaley, supra, to the effect that much must be left to the sound discretion of the trial judge as to the limits of detailing a former difficulty. We are unwilling to say in the present instance that the trial court abused its discretion in the rulings made.

Lastly, counsel for appellant urges that the court erred in overruling his objections to certain portions of the argument of the District Attorney to the jury.

The trend of this argument now complained of was to the effect that Judas had betrayed Christ, and Simon Peter had betrayed Christ three times, and the appellant, in his three statements had betrayed his wife, in that "in these three statements he had made he hasn't told the truth exactly about the homicide of his wife."

■■ Criminal trials are adversary proceedings, and as stated in other opinions, are not social affairs. Argument of counsel should not be so restricted as to prevent reference, by way of illustration, to histori-

cal facts and public characters, or to principles of divine law or biblical teachings. Pacific Mut. Life Ins. Co. of California v. Marks, 230 Ala. 417, 161 So. 543.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.

