269 So.2d 147

**Gregory Allen PADGETT**

v.

**STATE.**

1 Div. 253.

Court of Criminal Appeals of Alabama.

Sept. 12, 1972.

Rehearing Denied Oct. 3, 1972.

Matranga, Hess & Sullivan and Roderick P. Stout, Mobile, for appellant.

William J. Baxley, Atty. Gen., and Don C. Dickert, Asst. Atty. Gen., for the State.

TYSON, Judge.

Appellant, Gregory Allen Padgett, charged with the murder of his wife, Sandra Padgett, was indicted for murder in the first degree. Jury trial resulted in conviction, and verdict and judgment fixed punishment at imprisonment in the penitentiary for life.

The homicide in question was first investigated by Sergeant Henry Bradford of the Saraland Police Department. Bradford testified that on the morning of October 18, 1970, at 2:02 a. m., he received a call that a shooting had taken place at 1223 Martha Allen Drive in the Saraland com-

munity, in Mobile County, Alabama. The appellant resided at this home with his wife, Sandra, along with his mother and his stepfather, who owned the home.

Upon investigation of the incident, Sergeant Bradford found the appellant and his parents seated in the den. When Sergeant Bradford entered the room, appellant stood up and was heard to say, "What have I done, Pete?" Sergeant Bradford then went into the bedroom where he discovered the body of deceased, Sandra Padgett, lying in bed "covered up with covers to her neck and the top of her head missing." From the appearance of the room, Sergeant Bradford detected no sign of a struggle. Lying beside the bed on the floor was a high powered rifle, being a .303 British Enfield. At this time the appellant was placed under arrest and taken into custody. According to Sergeant Bradford, appellant repeatedly stated, "What have I done, what have I done?" Other officers began arriving at the scene, including Lt. Mann, the chief investigating officer, who took photographs and made an outlay of the bedroom.

The State presented evidence which tended to show that there had been numerous difficulties between the parties prior to this incident. The following testimony relates to the events leading up to the shooting on the night in question.

Ronnie Brown, deceased's fourteen year old brother, testified that he was with the appellant at appellant's place of business, Easy TV and Stereo Rental Company, in Mobile, on October 18, 1970, from about 10:30 that morning until around 7:30 or 8:00 that night. During this time two colored girls came into the shop and Ronnie remembered Greg having remarked to him that he thought the girls were pretty. Ronnie testified that later that day he listened on an extension telephone to a thirty minute conversation between Greg and a colored girl. He stated that "they were talking about getting together or something like that." Ronnie further testified that later that night during dinner at the Phillips' home, Sandra and Greg had an argument "about this colored girl."

Ronnie testified that after dinner Greg was going to take him home; that Greg tried to force Sandra to ride with them in the car; that Greg "ran to the car and got her and threw her against the side of the car." At that point Ronnie got out of the car and ran inside to tell Greg's mother. Greg and Sandra finally left the Phillips' home without Ronnie, who stayed the night there. He was awakened during the night when he heard the appellant shouting for his (appellant's) parents to get up. He heard the appellant state that it (the shooting) was an accident, that "she pulled the gun."

Guy T. Powell, Jr., who was the manager of Easy TV and Stereo Rental Company at the time in question, testified for the defense. He stated that he had occasion to see Greg and Sandra at the shop on October 18, 1970, approximately between the hours of 8:30 and 9:15; that during this time he noticed no animosity between them other than the fact that appellant had complained about having hot dogs for supper. He further stated that he asked them to come over to his house the next day for dinner, but Greg remarked that he was going hunting the next morning with Sandra's brother, Ronnie. Greg and Sandra did agree to drop by that afternoon.

Mrs. Virginia Brown, mother of the deceased, testified as witness for the State. She stated that on the night in question Greg and Sandra came to her house about midnight. During the course of a conversation there, Greg made the statement, "You should have seen this good looking Negro girl that came in the shop today; she was fine." This comment, according to Mrs. Brown, generated a rather heated exchange of words between Greg and Sandra. They left Mrs. Brown's house around 1:30 a. m. Mrs. Brown testified as to prior difficulties between appellant and her daughter, Sandra.

Gordon Davis, as witness for the defense, testified that he and appellant, along with Sandra's brother, Ronnie, had planned on going on a boating and stalk hunting trip on the morning that this incident occurred. They had planned on taking their guns with them.

As a witness in his own behalf, the appellant testified that the shooting was an accident. He stated that on the night of the shooting, after dinner at the Phillips' home, he and Sandra went to his place of business, Easy TV and Stereo Rental Company, for a short while. During that time, Sandra began looking at a Playboy magazine which she found on his desk. Several times she asked appellant whether he thought the models were prettier than she was. He stated that he just laughed, making no other response. Later that evening, when the couple stopped by Sandra's mother's house, Greg admittedly "nagged" Sandra about the girls in the Playboy magazine "to try to irritate her."

Sandra and Greg arrived at the Phillips' home at approximately 1:45 a. m. According to the appellant, he and Sandra went into the bedroom and while Sandra was preparing to go to bed he removed a rifle from a gun rack which was on the bedroom wall. His stated purpose was to clean the rifle in preparation for a hunting trip later that day.

Appellant opened the bolt of the rifle, ejecting an empty round which hit the closet door making a loud noise. This occasioned Sandra to say, "Be quiet, you're going to wake up everyone in the house." Appellant stated that at this time he was standing alongside and near the middle of the bed. He then took the gun and laid it on the side of the bed, the barrel of the gun pointing toward the head of the bed. Appellant then began removing his trousers in preparation for bed, and as stated in his own words, "My wife had gotten in bed and had rolled over and was pulling the cover up and the gun moved, and when the gun moved I turned around and grabbed it, and it went off." Then, according to appellant, he dropped the rifle and ran screaming to his parents for help.

Mrs. Phillips, appellant's mother, testified that she ran into the appellant in the hallway to which both of their bedrooms opened, and that Greg was "holding to his pants and screaming, 'Mother, my wife, my wife.'" She further testified that she tried to restrain him, but appellant threw himself across the bed where Sandra's body was lying.

In the opinion of Doctor Byron K. Montgomery, a pathologist who examined the body, the deceased died due to massive trauma to the head caused by a gunshot wound.

I

Betty Jean Hoskins, witness for the State, stated that she was a neighbor of Greg and Sandra Padgett at the time in question. On direct examination of this witness the following occurred:

"Q Okay. Now, how long did you live on Martha Allen Drive, please, ma'm?

"A I'd say two years.

"Q Two years. Mrs. Hoskins, would you tell these thirteen gentlemen and the Court, please, m'am, whether within six months prior to the time that Sandra was killed you viewed, saw or heard any difficulties between Greg and Sandra?

"A Yes.

"Q And how many months prior to the time she was killed was this, please, m'am?

"A I'd say about two months before she was killed.

"Q All right. Now, tell us what happened.

"A It was about midnight Saturday night and me and my husband had already gone to bed, and I heard somebody pecking on my window and I jumped up

and looked out my window and I seen them talking loud out there, so I woke my husband up and—

"Q Let me stop you a second. You said that you seen them; who did you see?

"A I seen Maxine Phillips and P. O. Phillips, and I seen Greg and Sandra.

"Q Where were they?

"A Well, Greg and Sandra and P. O. was under the carport and Maxine was walking back after she had banged on my window and woke me up.

"Q All right. Did you hear them talking?

"A Well, Sandra and Maxine was crying.

"Q Crying—

"A And—

"MR. MATRANGA: At this point, I'm going to object to any more evidence of any isolated occurrence unrelated to the night in question.

"THE COURT: Was it in the presence of the defendant?

"MR. GRADDICK: Was Greg there?

"A Yes, sir.

"THE COURT: The Court wishes to state at this time, and for the jury, that these—overrule the objection, that—

"MR. MATRANGA: Except

"THE COURT: —these instances are not being admitted as showing the defendant's guilt, but it is being admitted to show whether or not the State has been able to prove a malice and it's being admitted for the purpose of showing or not showing a motive, but it's not being admitted as showing his guilt of this offense. And you have an exception, Mr. Matranga. All right. Go ahead and tell us.

"WITNESS: I jumped up and looked out my window and Maxine was going back under the carport, and I woke my husband up and I told him to call the police, that they was arguing and everything under the carport; and then I got my housecoat on and I run over there."

Mrs. Hoskins then proceeded to give a rather detailed narrative of what she observed during this former difficulty between the Padgetts.

■ The rule is well settled in Alabama that the State may prove former acts of hostility by the accused toward the victim for the purpose of showing motive and malice. Wright v. State, 279 Ala. 543, 188 So.2d 272; Emerson v. State, 281 Ala. 29, 198 So.2d 613; Spain v. State, 37 Ala.App. 311, 68 So.2d 53, cert. denied 259 Ala. 606, 68 So.2d 58. The reason for the foregoing rule is well stated in *Spain,* supra, per Harwood, J.:

"When evidence of a former difficulty between a defendant and the assaulted party is offered by the State, it is for the purpose of shedding light on the true conduct of the defendant at the time of the subsequent difficulty for which the accused is on trial. Gray v. State, 63 Ala. 66; McAnally v. State, 74 Ala. 9. • • • • ."

■ While uncertainty has prevailed in Alabama with respect to the extent to which the details of a former difficulty may be proven, we are of the opinion that a large measure of discretion should be given to the trial judge. As Judge McElroy has stated in McElroy, the Law of Evidence in Alabama, Second Edition, Volume I, Section 45.06(6):

"It is submitted that the sound rule to apply is: If the gravity or triviality of a former difficulty or quarrel is material to be proved, the trial court should exercise its discretion to admit evidence of such details or particulars as is necessary to a correct ascertainment of such gravi-

ty or triviality, even though such evidence tends to show who was at fault in such difficulty or quarrel."

■ Where, as here, the evidence used to convict the accused is mostly circumstantial, it is all the more important to ascertain what feelings or sentiments the accused had on prior occasions expressed toward the victim, as tending to show either malice or motive of the accused. Thus, the trial judge, in allowing a full description of everything that took place in the former difficulty, acted within his discretion, and such was not erroneous. See *Wright and Emerson,* supra.

II

Lieutenant Frank Mann, the chief investigation officer at the scene, testified that he observed the bullet hole in the wall and stated, without an objection being interposed, that the bullet entered the wall at approximately a five degree downward angle.

During further examination of this witness, the record discloses the following:

"Q All right, sir. Now, as to the wound itself, Lt. Mann, did you have an opportunity to take close examination of the wound of the head, sir?

"A Yes, sir, I did.

"Q And do you have an opinion from your observation as to the angle of the part of the head that's missing?

"A Yes, sir—

"MR. MATRANGA: If Your Honor please, now we certainly are going to object. This is very technical, what we are talking about—the anatomy; we're talking about a wound of the human body; we are talking about the fragments of the skull—bone, different stresses, strength, and so forth. I submit to Your Honor that this witness certainly is not qualified under the circumstances of these photographs to show or

render an opinion any more than anybody else in this Court; and we submit that he is not an expert and that his opinion in this case, if he were allowed to give one, would be mere speculation and guess; that if a medical man would come in, or someone of that nature, who could perhaps reconstruct this thing and has training in that field, perhaps; but certainly not this witness in this particular type question.

"THE COURT: Lieutenant, would this question be based upon what you personally saw, or what you have concluded from a lot of other things?

"WITNESS: Your Honor, my answer would be from what I saw, sir.

"THE COURT: As to what you actually saw, the Court overrules the objection.

"MR. MATRANGA: I except.

"MR. GRADDICK: Lt. Mann, what was the angle of the part of the head that was missing?

"A In my opinion, sir, the angle of the wound to the head was from approximately at the right eye in a downward movement, taking off the biggest part or the largest part of the deceased's head.

"Q Was there more skin on one side than there was on the other?

"A Yes, sir. It went down at an angle, like this part of the skull right here was left on, but this part down through here and around was missing."

■ The question posed to Lieutenant Mann in reference to the condition of the deceased's head was not objectionable as calling for opinion evidence, but rather it called for descriptive matter based on his own personal observation. To so testify, no expert knowledge is necessary. There was testimony that Lieutenant Mann saw the body of deceased shortly after death, examined the wounds upon it, and examined the bullet hole in the wall. We see no reason why he should not be allowed to

state facts based upon those observations. In effect, Lieutenant Mann's testimony in this regard was merely a description of the character of the wound. This testimony being competent, there was no error in the court's ruling. Reid v. State, 181 Ala. 14, 61 So. 324. See also McDonald v. State, 241 Ala. 172, 1 So.2d 658; Kozlowski v. State, 248 Ala. 304, 27 So.2d 818; McKee v. State, 82 Ala. 32, 2 So. 451; Mathis v. State, 15 Ala.App. 245, 73 So. 122.

### III

Further objection was made by appellant during the direct examination of Lieutenant Mann pertaining to appellant's position at the time of the shooting. From the record we find the following:

"Q All right, sir. Now, in using the wall here as an example, Lt. Mann, could you demonstrate for the jury the angle that you just demonstrated by holding it in the air, sir?

"A Yes, sir. We will take this as the head of the bed here—the bed was going this way, the bullet hole went in at an angle of approximately five degrees— five degree downward angle, about like this (demonstrated.)

"Q All right, sir. And did you stand off to get some sort of angle about the height from which it was fired?

"MR. MATRANGA: We object to him leading the witness—'did you stand off?'

"THE COURT: Sustained.

"MR. GRADDICK: Do you have an opinion about where the gun was fired from, sir?

"MR. MATRANGA: We object to the question on the ground that this officer is not qualified to have an opinion; he has not laid the proper foundation for this witness to give an opinion.

"THE COURT: Overruled.

"MR. MATRANGA: We except.

"WITNESS: My opinion is that it was fired from the foot of the bed, sir.

"MR. GRADDICK: All right, sir. And at what height—do you have an opinion as to what height the bullet originated from?

"A Approximately hip level, sir."

The rule in Alabama is that in a murder prosecution it is not permissible for a witness, whether qualified or not, from a mere examination of the wounds, to draw conclusions for the jury as to the relative position of the parties at the time of the shooting. Richardson v. State, 204 Ala. 124, 85 So. 789; Crawford v. State, 262 Ala. 191, 78 So.2d 291. This rule is also fully applicable to medical experts. Edwardson v. State, 255 Ala. 246, 51 So.2d 233; Roan v. State, 225 Ala. 428, 143 So. 454.

Certainly a material inquiry in this case was the position of the parties when the shooting occurred. The defense questioned Lieutenant Mann as to whether the bullet could have been fired from a horizontal position, but Mann said his opinion was that it could not. It is uncontroverted that at the time the rifle was discharged, the deceased was lying in her bed. It is the position of the appellant relative to the deceased at the time the gun was fired which is uncertain and of critical importance. If the gun was fired from the foot of the bed, as the prosecution attempted to establish, then that necessarily places the appellant's position as being at the foot of the bed. Keeping in mind the fact that we know what the deceased's position was, Lieutenant Mann's testimony was, in effect, opinion evidence as to the relative position of the parties at the time the fatal wound was inflicted. This was error.

Appellant's own testimony placed him alongside and near the middle of the bed shortly before the shooting occurred. Thus, we can perceive of the possible prej-

udice suffered by appellant by the admission of this aspect of Lieutenant Mann's opinion evidence.

In dealing with the question of possible prejudice, it is wise to be mindful of what our Supreme Court said, per Goodwyn, J., in Boggs v. State, 268 Ala. 358, 106 So.2d 263:

" 'We have examined the entire record and are not satisfied that the admission of such evidence was without injury to substantial rights of appellant. He was charged with and found guilty of murder in the first degree; and we think the evidence clearly supports such finding. But, in so finding, it was within the sole discretion of the jury to prescribe as punishment either the death penalty or imprisonment in the penitentiary for life. Code 1940, Tit. 14, § 318. We cannot possibly probe into the mental processes of the jurors to ascertain whether and to what extent incompetent testimony actually had in influencing the exercise of their discretion in fixing the punishment. We are not willing to say it did not have some influence on them, thus affecting the substantial rights of appellant."

Furthermore, regarding the competency of a nonexpert witness to testify as to the direction a bullet travelled before entering deceased's body, our Supreme Court in McKee v. State, 82 Ala. 32, 2 So. 451, per Chief Justice Stone, said:

"The opinion of the witnesses, based on the appearance of the wound, that the blow was inflicted from the front and not from the rear, was properly excluded. The wound was susceptible of description, and it was properly left to the jury to determine from what direction the blow came. Walker v. State, 58 Ala. 393; Bennett v. State, 52 Ala. 370."

See also Humber v. State, 19 Ala.App. 451, 99 So. 68, where the trial court was held in error for allowing into evidence the testimony of a medical expert as to the direction from which the shot was fired.

Further support of our holding here today can be found in Plumlee v. State, Okl. Cr., 361 P.2d 223, wherein the court stated:

". . . The witness was not qualified as an expert in the field of ballistics and was therefore incompetent to testify as to the direction the bullets travelled before entering the body. We must assume that the introduction of the clothing of deceased was allowed for the purpose of allowing the jury to determine these questions for themselves and we therefore conclude that the testimony of Dr. Couch was not only incompetent insofar as he testified as to the course of the bullets, but that it also invaded the province of the jury. The objection by defendant to this line of testimony should have been sustained. . . . "

In the same vein, see Lester v. State, 212 Tenn. 338, 370 S.W.2d 405.

The record does not disclose that Lieutenant Mann was possessed of knowledge in the field of ballistics beyond that of the ordinary man. In view of the facts that the prosecutor did not attempt to qualify Lieutenant Mann as an expert in the field of ballistics, it is apparent from the foregoing authorities that the trial court committed reversible error in permitting Lieutenant Mann to testify as to the direction from which the bullet came before striking the head of deceased.

We pretermit consideration of other assignments of error raised in brief as they are not likely to occur on retrial of this cause.

For the reasons set out herein, the judgment of conviction is due to be reversed and the cause is hereby remanded.

Reversed and remanded.

All the Judges concur.