325 So.2d 557

**Cleo JACKSON, Jr.**

v.

**STATE.**

**I Div. 582.**

Court of Criminal Appeals of Alabama.

Nov. 18, 1975.

Rehearing Denied Dec. 16, 1975.

J. D. Quinlivan, Jr., and Lionel L. Layden, Mobile, for appellant.

William J. Baxley, Atty. Gen., and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State, appellee.

TYSON, Judge.

The indictment charged Cleo Jackson, Jr., with the first degree murder of Paulette Jackson by shooting her with a pistol. The jury found the appellant guilty of murder in the second degree and fixed punishment at twenty years imprisonment. The trial court then entered judgment in accordance with this verdict.

Charlene Whitt testified that she accompanied the deceased, Paulette Jackson, on the night of May 18–19, 1974, to several clubs where during the evening hours and early hours of Sunday morning they had several drinks. She testified that she and Paulette Jackson had seen the appellant, Cleo Jackson, earlier in the evening at the Dashiki Club where he had brought them a drink and tried to get them to come with him to the Flame Social Club. She testified that they did not go with him. She testified that early Sunday morning, about 3:30, she and Paulette were coming out of the Debonair Club when they saw two men stop and park a van near the curb. She stated that she then saw one of the men, whom she recognized as being the appellant, Cleo Jackson, start walking on the sidewalk toward them. From the record (R. pp. 25–26):

"Q   What did Cleo do then?

"A   He ran up and he said, 'Bitch, I got something I want to talk to you about,' and hit her on the side of the head. Then I saw fire coming from the gun and he was holding her by her right hand and I was looking—fire was coming from the gun, but it didn't seem at the time he was shooting her then. And

she fell back on the blue car, and that is when he pointed the gun to her head and I left. I went to the car—called her father to tell him something happened. By the time I came back to the club, he was—the bartender to the club was outside then. And Cleo was standing up. He shot at Paulette again. She was on the ground. She was lying on the ground and he just ran off.

"Q   Now, at the time you saw Cleo hit Paulette, I think you said on the head?

"A   Yeah.

"Q   Had you heard any shots before then?

"A   No, not before then.

"Q   Have you—had you seen Paulette with a gun before then?

"A   No.

"Q   Did you see Paulette with a gun that night?

"A   No, not that night.

"Q   Did Paulette in any way hit Cleo before Cleo hit her?

"A   No, she—I called her, she was just standing up there with her head. She didn't say anything. He just ran up and hit her. They started fighting.

"Q   Now, where this club was, is that in Mobile County?

"A   Yes.

"Q   Is that in the State of Alabama?

"A   Right."

On cross-examination, she testified that when Paulette's body was turned over, she saw that Paulette had a pistol.

Charles W. Green testified that he was leaving the Debonair Club on the early morning of May 19, 1974, between 4:00 and 5:00. He said that he observed some scuffling between the appellant and a young woman, and that he later heard some shots.

On cross-examination, he testified that he heard four or five shots in just a matter of a few second's time.

Wayne Pettway testified that he drove up in a van truck near the Debonair Club between 4:00 and 5:00 a. m., on May 19, 1974. He saw the deceased, Paulette Jackson, and Charlene Whitt come out of the club, and he saw the appellant go up to them and say, "Hi, I want to talk to you." He then saw the appellant run toward the deceased and hit her. He did not observe the deceased do anything. He said that he later felt her pulse and saw her body placed in an ambulance.

On cross-examination, he testified that he heard five or six shots over a thirty or forty second period, but that he never did see a gun in the hands of the deceased woman.

Arthur Law testified that he was leaving the Debonair Club on May 19, 1974, between 4:30 and 5:00 a. m., when he observed the appellant get out of a van and walk toward two women. He said he heard the appellant call one of them an ugly name, and then he saw the appellant strike the deceased. He stated that he saw the deceased fall back, and that he did not see a weapon in her hand. He stated that the appellant started shooting and several shots were fired.

On cross-examination he said he heard either four or five shots in less than a minute. He testified that later he saw some empty shells, which were shown to him by one of the officers.

Charlie Outsey testified that he was the father of the deceased, Paulette Jackson. He testified that the day before his daughter's death, he had bought a .25 caliber automatic pistol, which he gave his daughter "for protection."

Mary Louise Williams testified that she had known the appellant for about eighteen years prior to May 18, 1974. She testified that the appellant came by her home, and

that she was there with her boyfriend, as was her sister, Diane, and her boyfriend. She said that while the appellant was at their home, he made the statement that he "was going to kill her if he met her anywhere that day or night," and further, "If you kill the head, the body will die."

On cross-examination, she stated that the appellant stated, in their presence, that, when asked would he take his wife back, "No, he would never take her back . . . they would never go back together."

Oswald Pendleton testified that he knew both the appellant and his wife, Paulette Jackson, for several years prior to May 19, 1974. He stated that on the afternoon of May 19, around 1:00, he went over to their home and helped Paulette move some furniture in a truck from their home.

Over objection, he also testified that about three and one-half weeks prior to the date of the fatal shooting of Paulette, the appellant had fired a shotgun as Paulette was getting out of the truck, that the appellant "got out and shot, he shot the shins out from under her," and that Paulette started running away.

Mary Bush Foster testified that she had known the appellant for about nine months prior to May 18, 1974. She did not know his wife. She testified that on the afternoon of May 18, the appellant came by her home and watched TV with her until about 6:30 or 7:00 that evening. She testified that on the early morning of May 19, about 6:30 or 7:00, he came to her apartment, and that he appeared to have some powder burns on his neck. She testified that she was with the appellant when the police stopped them Sunday morning, and that she was driving the car.

Mobile Police Officer John Saxon testified that on the morning of May 19, 1974, he observed the appellant sitting on the passenger side of a "white over gold colored vehicle, occupied by the appellant and a female driver," that the car was coming

south on Catherine Street in Mobile, that he stopped the vehicle and observed the appellant holding a shotgun on his lap, and he placed him under arrest. Officer Saxon also identified a .25 caliber pistol and clip which were taken from the appellant at the time of his arrest.

Mobile Police Sergeant Marvin Bowman testified that he found the body of a colored woman shortly after 5:00 on the morning of May 19, 1974, lying on the sidewalk outside the Debonair Club in Mobile. He examined the body for vital life signs and detected none. As he turned the body over, he found a .25 caliber pistol and clip. He further testified that in the immediate area five .25 caliber spent shells, one .25 caliber spent bullet, and three spent .22 caliber shells, and two live rounds of .22 caliber hollow point bullets were found. He stated these were found within a six foot radius of the spot where the body of the deceased, Paulette Jackson, was lying. He testified that he saw the appellant, Cleo Jackson, about 7:45 that morning at Police Headquarters, that he saw a small laceration on the appellant's thumb, and that the appellant called his attention to what he stated was a burn on his neck, but that it appeared to be fingernail scratches to the officer.

Police Officer Ronald Meyers identified a number of photographs taken at the scene of the homicide.

Police Sergeant Bowman was recalled to the stand and stated that the time of the shooting occurred between 4:45 and 5:02 a. m., Sunday, May 19, 1974.

At this point, the two pistols and the live and empty shells found at the scene were stipulated into evidence. It was also stipulated that Dr. Small, State Toxicologist, would testify that the respective shells came from the respective pistols. Also stipulated into evidence was the coroner's report, dated May 20, 1974, which established the cause of death as due to bullet wound "over the left ear, which traveled through the left side of the brain and lodged in the left side of the skull."

Appellant's motion to exclude the State's evidence was overruled.

The appellant presented the testimony of a number of character witnesses.

The appellant took the stand and testified that he was thirty-two years of age, and had been married two years and six months to Paulette Jackson prior to May 18–19, 1974. He stated that they had separated only twice, for a couple of days, and this was just a few days prior to the homicide. He testified that they had always gone back together after prior separations. He testified that they had no children, but had lived together as man and wife. He denied making any threat in front of Mary Louise Williams and her boyfriend, Walter Mitchell, that he would kill his wife on the day of the homicide. The appellant testified that he did go by the home of Mrs. Foster, who was a friend of his, and that he had been over there that afternoon looking at TV and playing records. He testified that he decided to go out that evening and used Mrs. Foster's car. He stated that earlier in the evening he had run into the deceased, Paulette Jackson, and Charlene Whitt and bought each of them a drink at the Dashiki Club. He testified that he left the club and drove around, that he later saw his wife and Charlene coming out of the Debonair Club, and that he stopped and asked his wife to come home with him. He said that he stopped the two women and told them he wanted to talk with them a minute, and that his wife, Paulette, reached in her purse to pull a pistol, and that he reached for her hand. He stated that she scratched him, like a burn. He said that he heard two shots and then pulled his pistol and fired in an effort to defend himself. He testified that he later called over at Mary Foster's house because his shotgun was over there and he did not want to get her involved. He testified that he was riding in the car with Mary Foster when he was arrested.

## I

The appellant raises two contentions which he asserts as error. Appellant argues that the trial court erroneously, and over objection, permitted the State to show details of prior difficulties between the appellant and the deceased. In the first instance he calls attention to the testimony of one Oswald Pendleton, who testified that he assisted the deceased in moving her furniture on the day of the homicide, which testimony was permitted over objection, and that approximately three and one-half weeks prior to this date, the appellant stuck a shotgun through the window of a truck in which his wife was seated, and as she opened the truck door and got out, the appellant "shot the shins out from under her," and that Paulette got out and started running away (R. pp. 89–90).

Appellant also calls attention to Record Page 165, where, on cross-examination of the appellant, the State was permitted to ask if he had waited at his father's home for her to come home one night and tried to choke her. This question was answered in the negative (R. p. 165). *Lebo v. State,* 55 Ala.App. 624, 318 So.2d 319.

As noted by this Court in *Hill v. State,* 51 Ala.App. 515, 286 So.2d 924:

> "Former acts of hostility, including communicated threats, by the accused toward the victim are admissible for the purpose of showing motive or malice, and were here properly admitted. *Blue v. State,* 246 Ala. 73, 19 So.2d 11; *Padgett v. State,* 49 Ala.App. 130, 269 So.2d 147, cert. denied, 289 Ala. 749, 269 So.2d 154, and cases cited therein." See also *Tillman v. State,* 52 Ala.App. 282, 291 So. 2d 373, and authorities therein cited.

We are of the opinion that the trial court here properly admitted the disputed testimony.

## II

Appellant next calls our attention to the question asked the appellant, over objection, on cross-examination, as to whether or not he had had sexual relations with Mary Foster (R. p. 168), to which he replied, after the objection was overruled, in the affirmative.

On direct examination, the appellant testified that he had telephoned Mary Foster to come pick him up on the early morning following the homicide as he did not want to involve her. From the record on direct examination of the appellant (R. p. 163):

"Q What did you ask her to do?

"A I asked her to come take me to

. . .

"Q Did she?

"A Yes, sir, she came.

"Q Were you on your way to your car when you were arrested?

"A Yes, sir.

"Q Did you have any objects over at Mary Foster's house?

"A Yes, sir, I had a shotgun.

"Q You had a shotgun?

"A Yes, sir.

"Q Did you want to get it out of the house?

"A I had it in a storm—you know, I went to get it out because it was out there and I knew she was going to be involved and *I didn't want anybody to see that I was living with her.*

"Q Did you get the shotgun out to take it away from her house to shoot somebody else?

"A No.

**46**

"Q And when the police stopped you, were you trying to shoot them with the shotgun?

"A No, sir, the shotgun was in the back of the car.

"Q In the back seat?

"A Yes.

"Q Or the back floorboard.

"A Back of the car on the seat.

"Q And you were in whose car?

"A Mary Foster's.

"Q Was there any problem when you were arrested?

"A No, sir." [Emphasis supplied]

In light of the above testimony on direct examination, we are of the opinion that the trial court properly allowed the State to ask questions, over objection, as to the appellant's relationship with Mary Foster. Cases cited.

We have carefully examined this record and find no error therein. The judgment is therefore due to be and the same is hereby

Affirmed.

All the Judges concur.