DeCARLO, Judge.
John Charles (Jack) Doane was indicted by the Grand Jury of Montgomery County for unlawfully and with malice aforethought killing Catherine (Kitty) Doane by stabbing her with a knife. The appellant was arraigned on this charge and trial was commenced on June 17, 1975.
After a four-day trial the jury returned a verdict finding the appellant guilty of manslaughter in the first degree and fixing his punishment at five years in the penitentiary. The court entered judgment in accordance with the jury’s verdict and the appellant gave notice of appeal. The appellant renewed his notice of appeal when his request for probation was denied and his case is now before this court on appeal.
The record did not disclose a motion to exclude the State’s evidence, a request for the affirmative charge or a motion for a new trial. Therefore the sufficiency of the evidence was not raised and only a brief recitation of the facts will be given.
The evidence presented at trial showed that the appellant and the deceased, Catherine (Kitty) Doane were separated on April 13, 1974, and a divorce was being sought.
On April 13, 1974, the night before Kitty Doane’s death, the appellant was having a *650 birthday dinner for his mother at the Ames-bury Apartments where he lived in Montgomery, Alabama. His mother, sister, nephew, and Jim Leyland, a friend, were present. The party continued until about 11:30 P.M., when the appellant drove Ley-land to the Spanish Fort Apartments.
From Leyland’s apartment he proceeded to Kitty Doane’s residence in the Down-towner Apartments. On arrival, Doane knocked on the door and when there was no response he went to a local nightspot called Dale’s. In was about 12:30 A.M., and after he was allowed in, he saw Kitty Doane at the bar. According to appellant, Kitty was alone at the time and when she refused to let him take her home he left and went to Quinn’s, another nightspot. Doane remained there for approximately forty-five minutes and then returned to Dale’s. Kitty was sitting at the bar and at that time there was a man seated next to her. Doane again tried to persuade her to go home and she again refused. At that point he left and returned to Quinn’s.
Sometime after he returned to Quinn’s, he met a young lady that he knew and they sat at a table and talked. Shortly thereafter Kitty came to Quinn’s. Doane said she was screaming and that he could not understand her. After making the remarks, she slapped him and left. Doane said he then got into his car and when he started to drive off, Bruce Beaupit hollered at him to stop. Beaupit came over and asked Doane to take him to the Whitley Hotel, which he did.
On leaving the hotel, appellant drove to the Downtowner Apartments again. He parked his car on Scott Street beside the First Baptist Church and walked into the apartment building. Doane recalled that he knocked lightly on the door and simultaneously turned the knob. Doane said the door caught on something and that he pushed it open. He then saw a person that he first thought was Kitty but then realized it was a man in his underwear. Doane looked to his left and at that moment was struck on the head and knocked to the floor. Appellant said that when he hit the floor Kitty ran to the drawer where knives were kept and tried to get them. According to Doane, he was trying to get to his feet and was also trying to reach and grab Kitty’s hand when the man grabbed him from behind. They began to wrestle and Kitty came toward him with what be believed to be knives in both hands. He said he could not see what the objects were because the lights were dim. Doane threw up his left arm at that point and jumped back. He said Kitty then stabbed him on the wrist. Doane maintained it was a three-way fight with Kitty and the man fighting him. He stated that because of his injured arm he could not protect himself and, after Kitty started stabbing him in the stomach, he tried to get out the door. Appellant said he went out the door and turned to his left. He recalled that as he was going out the door he was struck some four times and Kitty was on her feet.
Bill Graham testified that he met Kitty Doane at Dale’s and at her invitation he went to her apartment. On their arrival he latched the door after they entered and she went to the refrigerator and asked if he would like a beer. Graham said “No” and she began to drink one herself. According to Graham, he was standing in the center of the living room near a coffee table, with his shirt and shoes off but with his trousers on. Graham recalled “The door came open all of a sudden, and Jack Doane looked in, and told me, he said, T see you in there.’ He looked straight at me.” At that point Doane pushed the door open and headed straight for the kitchen. Graham said that Doane removed something from a drawer and then charged straight at him. He ran to the back part of the apartment but Doane pursued him and stabbed him on the nose. Graham felt the blood “gushing out” and ran from the apartment. He said that Kitty was in the vicinity of the refrigerator when he left.
Graham ran down the hallway and then headed north on Perry Street. He said that he had traveled about two blocks when he heard a car. Graham continued to run and heard the sound of a car’s brakes slam on *651 behind him. When he looked up he saw the appellant and heard him say: “ ‘It’s going to be a pleasure to kill you, you son-of-a-bitch.’ ” Graham said that at that point he ran, jumped over a fence and went to the bus station from which he was later taken to the hospital.
I
The appellant contends that the admission of the testimony of the witness, Graham, concerning events occurring subsequent to Graham’s exit from the deceased’s apartment was immaterial and prejudicial. Counsel argues that the information elicited from Graham, including the purported threat, was introduced solely to show that the appellant may have had a tendency to commit the crime, with which he was charged and that this was error. Counsel further argues this evidence had no bearing on the questions of knowledge, plan, design, motive or identity. Moreover, counsel for the appellant argues that these events after the incident at the apartment could not be part of the res gestae of the crime with which the appellant was indicted. He insists that the events leading up to the death of Catherine Doane were at an end insofar as the evidence shows.
In Smith v. State, 88 Ala. 73, 7 So. 52, the facts were similar to those giving rise to the testimony being objected to in the instant case. In Smith v. State, the facts show that a homicide occurred on the evening of January 17, 1888 at the home of Mary Goodwin, where J. D. Connelly and one Spears were sitting by the fire. Subsequently, the defendant and Joe Gill entered the house and Spears and Gill became involved in a slight altercation. As a result the defendant fired a shot hitting John Spears in the right hip and then turned and fired again, shooting the deceased in the breast. Spears testified that he then ran from the house and defendant shot at him after he had run some thirty yards. The Supreme Court said in Smith v. State:
“According to the testimony for the prosecution, the shooting of Spears and of Connelly, the deceased grew out of one altercation, and was one continuous transaction. And the pursuit of Spears by defendant, firing at him as he ran immediately after inflicting the death-wound on Connelly, was not only part of the res gestae, but tended strongly to show the hostile spirit under which he was acting. Speaking on a kindred subject, the General Court (Supreme Court) of Virginia in Heath's Case, 1 Robertson, 735, 743, said: ‘The fact of the shooting, as being a part of the circumstances and of the res gestae, ought not to have been precluded from being given in evidence to the jury, although such evidence might itself have tended to prove a distinct felony committed by the prisoner.’ ”
See: Granberry v. State, 182 Ala. 4, 62 So. 52; Smith v. State, 183 Ala. 10, 62 So. 864.
In the present case the appellant’s confrontation with Graham on the second occasion resulted from the earlier altercation and seems to have been a deliberate act on the part of the appellant. Graham testified that he was some two blocks from the apartment when he first heard a car behind him. He said he then cut across a parking lot and when he came near the Arco Station on the corner of Adams and Perry Streets he heard a car’s brakes slammed on behind him. When he looked up he saw the appellant and heard him make the threat.
According to the testimony for the State, the stabbing of Graham and Kitty Doane grew out of the same encounter and was one continuous transaction. The pursuit of Graham by the defendant was not only part of the res gestae, but tended strongly to show the “hostile spirit under which he was acting.” Although such evidence might of itself have had a tendency to prove another felony, being a part of the circumstances and of the res gestae, it should not be precluded from the jury’s consideration.
II
The appellant maintains- that the failure to exclude evidence of difficulties occurring prior to the marriage of the appellant and his deceased wife constituted abuse of the trial court’s discretion. Counsel argues that *652 the incident which occurred in 1970 could not have any bearing on the question of whether, during the marriage, the appellant had threatened harm to the deceased should she seek a divorce. Further, appellant insists that this event was too far removed in time to have any effect other than to prejudice the jury.
The incident alluded to in appellant’s contention is found in the following testimony of the deceased’s brother:
“Q Did you ever have an occasion to go to Qunn’s [sic] with Jack Doane and your sister?
“A Yes, sir, I have on many occasions.
“Q All right. Did a fight every erupt during any of these occasions?
“A Yes, sir.
“Q Between Jack and your sister?
“A Yes, sir, it did.
“Q All right. I want you to tell the jury did Jack Doane ever try to harm your sister during any of these fights?
“A Yes, sir.
“MR. SMITH: We object to that.
“THE COURT: Wait just a minute. What, if anything, did he do to her?
“Q (By Mr. Thomas) All right. That is what I’m getting to: What if anything, did he do to her?
“MR. SMITH: I would like to know the time and place or the approximation of it.
“Q (By Mr. Thomas) All right. Give us the time and the date, the best of your recollection, and where it was.
“A The best of my recollection, it was in November of 1970.
“Q All right.
“MR. SMITH: In November of 1970?
“THE WITNESS: Yes, sir.
“Q (By Mr. Thomas) All right. Now, tell the jury under what circumstances and what happened?
“A Well, sir, we went up to sing with Henry the piano player.
“Q Who is Henry the — piano player where?
“A He plays down at Quinn’s, sir.
“Q Okay. Who was with you?
“A Jack Doane, my sister, and myself.
“Q Okay.
“A And we were up there singing with the piano player. Well, he didn’t — I don’t know what he had against Henry, but he called Kitty back. He told her to get up off the stool, and everything else, because we’re sitting next to Henry on the piano stool; and he was playing and we were singing. And he told her to get up off the piano stool and get back over to the table, and a few other words; and an argument ensued, and we left out of there.
“Q You and Jack and Kitty left?
,!A Right, sir. And my sister—
“Q What happened when you got outside?
“A Well, nothing happened when we got outside, but my sister drove Jack Doane to his apartment, where he lived at the time.
“Q Were you in the car with her?
“A Yes, sir.
“Q And what happened while they were driving?
“A Jack Doane had gotten out of the car, and at first we were going into his apartment.
“Q Were they separated or married?
“A They weren’t married at the time, sir.
“Q Oh, this was before they got married?
“A Yes, sir.
“Q Okay. Fine. What happened?
“MR. SMITH: We object to that.
“THE COURT: Overruled.
“THE WITNESS: Well, we were going to go into his apartment for a drink before we went back to Hope Hull trailer park.
“MR. SMITH: May we just have a continuing objection to this line of testimony?
“THE COURT: Yes. Let the record show that he has a continuous objection to these questions and a continuous exception to the court’s ruling.
“MR. SMITH: Thank you, Your Honor.
“Q (By Mr. Thomas) This was before they got married, right?
*653 “A Yes, sir.
“Q All right. Now, tell the jury what happened?
“A Well, we were going to go into the apartment, and he was calling this Henry the piano player at Quinn’s — he was calling him a—
“Q He was cussing him?
“A Right.
“Q Okay. Tell us what happened.
“A He grabbed my sister by the throat; and I was out of the ear already, and my sister didn’t want to come out of the car.
“Q Grabbed her by the throat?
“A Right, sir.
“Q Did you see him grab her by the throat?
“A Right, sir.
“Q What was she doing while he was grabbing her by the throat?
“A She was hollering, ‘Jimmy,’ as much as she could, ‘he’s choking me.’ And I didn’t know what in the heck to do; the man is bigger than me.
“MR. SMITH: Object to it, if the court please.
“THE COURT: Yes.
“Q (By Mr. Thomas) What did you do, if anything?
“A Well, I had infantry training, and the only thing I could tell him, if he doesn’t leave her alone, I was going to do something—
“MR. SMITH: We object to it and move to exclude it. It’s not responsive, and it calls for mental operation. He stated a mental operation, not stated a fact.
“Q (By Mr. Thomas) Did you grab him?
“A No, sir, I did not. I threatened him, though, to grab him.
“Q You threatened to grab him—
“A Right, sir.
“Q —where?
“A By his scrotum.
“Q Did he then turn her a loose?
“A Yes, sir, he backed away; and then at the same time what happened, my sister was behind the wheel, and the motor was running. And she hit the accelerator pedal fast; it was in reverse. And the next thing I know Jack Doane went up on his head backwards and landed on his belly, just like a stick falling over. And I reached in and I grabbed the keys out of the ignition and I told Katy — I call her Katy — Kitty Doane — .”
It is settled law in Alabama that the prosecution may prove former acts of hostility by the accused toward the victim for the purpose of showing motive and malice. Wright v. State, 279 Ala. 543, 188 So.2d 272; Emerson v. State, 281 Ala. 29, 198 So.2d 613; Spain v. State, 37 Ala.App. 311, 68 So.2d 53. However, uncertainty prevails with respect to the extent to which the details of a former difficulty may be proved. This court in Padgett v. State, 49 Ala.App. 130, 269 So.2d 147, in speaking to the extent to which details of a former difficulty may be proved, said:
“. . .we are of the opinion that a large measure of discretion should be given to the trial judge. As Judge McElroy has stated in McElroy, the Law of Evidence in Alabama, Second Edition, Volume I, Section 45.06(6):
“ ‘It is submitted that the sound rule to apply is: If the gravity or triviality of a former difficulty or quarrel is material to be proved, the trial court should exercise its discretion to admit evidence of such details or particulars as is necessary to a correct ascertainment of such gravity or triviality, even though such evidence tends to show who was at fault in such difficulty or quarrel.’ ”
The testimony concerning the incident occurring in 1970, just prior to the appellant’s and the deceased’s marriage, was a fact from which the jury could infer what motivated the appellant to do the act charged. Such evidence tended to show the malice or motive inducing him to commit the offense.
The trial judge in allowing the detailed testimony of the former difficulty acted within his discretion and it was not error.
*654 III
The appellant complains that the judge in his oral charge referred to the word “necessity” in charging the jury as to the elements of first degree manslaughter and again used the same word during his explanation of self defense. The appellant insists that the jury through confusion, would have no choice other than to find the appellant guilty of manslaughter in the first degree based upon the court’s oral charge.
The charge in question reads as follows: “Manslaughter is the unlawful filling [sic] of another without malice either expressed or implied, which may be either voluntary upon a sudden heat of passion or involuntary but in the commission of some unlawful act. Manslaughter in the first degree is the voluntary and unlawful depriving of a human being of his life. There must be a positive intention to kill or an act of violence from which ordinarily in the usual course of the events, death or great bodily harm may result. It is not necessary that the perpetrator intended or willed the death of the party. It boils down in its final analysis, ladies and gentlemen of the jury, this of taking of human life to the question of necessity. Was it necessary to take human life in this case? Based on that doctrine of necessity, was it necessary, if the Defendant did take her life? And that is what it’s boiled down to.” [Emphasis added.]
Following the charge on first degree manslaughter, the court charged on second degree manslaughter, character evidence and then gave the following instruction on self defense:
“Now, there is another question involved in this case, and I want to direct your attention to that, the question of self-defense. You have heard the evidence in this case as to what happened to the Defendant, if it did happen, and you are convinced beyond a reasonable doubt that it did happen. There are three essential elements of self-defense, which are this: that the Defendant must be free from fault in bringing on the difficulty. This appears to mean that the Defendant must be wholly free from fault in bringing on the difficulty, that he must not say or do anything to provoke or bring on the difficulty, must not be unmindful of the consequences of this or any wrongful word or act. There must be a present impending peril to life or danger of great bodily harm either real or so apparent as to impress on the mind of a reasonable prudent person a reasonable belief of existing necessity." [Emphasis added.]
It is the use of the word “necessity” in the two portions of the court’s oral instructions that the appellant contends, through confusion, would have caused the jury to find the appellant guilty of manslaughter in the first degree. Counsel argues that from the facts presented at trial the jury could have concluded that the appellant’s actions were in self defense and that he acted out of necessity. Further, counsel insists that when the court defined manslaughter in the first degree as a killing of necessity, the jury had no choice but to find the appellant guilty of manslaughter in the first degree. He argues the jury could not be expected to understand that the trial court may have used the word “necessity” with two different meanings.
A careful review of the court’s oral charge shows that the court instructed the jury as to all the other degrees of homicide, as well as manslaughter in the first degree. The instructions in no way suggested or directed the jury to find the appellant guilty of first degree manslaughter. The words complained of, “necessary” and “necessity” when read in the context of the complete charge would seem to negate rather than demand a finding of first degree manslaughter in any case where the jury found the appellant’s actions necessary.
Taken in its entirety the court’s instruction did not confuse or mislead the jury. The instructions were in accord with the law and were proper.
IV
We have studied the record and find no reversible error.
AFFIRMED.
*655 TYSON, P. J., and BOWEN, J., concur.
BOOKOUT, J., dissents.
HARRIS, J., recuses.