74 So.2d 436

**Alvin Howard NEELLEY**

v.

**STATE.**

**3 Div. 670.**

Supreme Court of Alabama.

Aug. 30, 1954.

Beddow & Jones, Roderick Beddow and G. Ernest Jones, Jr., Birmingham, and W. J. Williamson, Greenville, for appellant.

Si. Garrett, Atty. Gen., and Robt. Straub, Asst. Atty. Gen., for the State.

GOODWYN, Justice.

The appellant, Alvin Howard Neelley, was indicted by the Grand Jury of Butler County, Alabama, and charged with killing Donald Henry, a ten year old boy, unlawfully and with malice aforethought, by shooting him with a rifle. The appellant pleaded "not guilty", was tried and convicted of murder in the first degree, and sentenced to life imprisonment in the state penitentiary.

The record discloses the following facts: On November 26, 1952, the appellant resided near the Camellia City Drive-In Theater located on the outskirts of Greenville, Alabama. His house faced the highway and was east of the road leading to and from the theater. The theater exit road was south of appellant's house and ran in a northwesterly direction until it joined the common road used for both entrance and exit. His house was separated from the

exit road by a fenced garden on the south and a vacant lot which joins the garden on the east, the exit road on the south, the combination entrance and exit road on the west, and the highway on the north. This lot was overgrown in rag weeds, as well as other weeds, and several privet hedge bushes with green leaves. The testimony concerning the height and density of these weeds and bushes was in conflict. The exit road was illuminated by the use of a number of electric lights placed on short poles with reflectors flooding the light toward the roadway.

On the evening of the shooting the deceased, in company with his older brother and three Nelson boys, walked into the Camellia City Drive-In Theater by way of the exit road. They paid no admission, stayed long enough to see the comedy, and then proceeded out of the theater by the route they used to gain entrance.

The tendencies of the evidence indicate that as the boys were leaving the theater the two older boys decided to throw rocks at appellant's house, and the three smaller boys, including deceased, ran ahead to get out of the theater before the rocks were thrown. The two older boys stayed near the edge of a metal fence directly behind and south of appellant's house. The three smaller boys continued to a point at the edge of the vacant lot, above mentioned, which was approximately west by southwest of appellant's house. The deceased, who was behind the other two small boys, stopped and crawled into the bushes on the vacant lot. The other small boys then returned and joined the deceased in the bushes and the three boys remained there for several minutes and until after the fatal shot was fired. According to the testimony of one of the small boys, he and his brother were lying on the ground, and the deceased was squatting in the bushes immediately to the right of them. During this time the two older boys, who had remained at the end of the metal fence, threw several rocks in the direction of appellant's house. The boys heard a rock hit some metal at or in the

vicinity of appellant's house and immediately thereafter the fatal shot was fired.

The appellant testified that he and his wife were in their kitchen at about 8:00 o'clock on this evening, when he first heard rocks striking his residence. Upon hearing the rocks hit his house, he went into the bedroom, secured his 22 caliber rifle, went out in front of his house, and assumed a squatting position behind the smokehouse, which was located inside the garden at the northeast corner. He related that he then saw several boys running along the exit road toward the highway and when last seen they were continuing in that direction. He denied seeing them stop or go into the bushes. The appellant then testified that some three or four minutes later he saw some one at the end of the metal fence throw some rocks which hit his house. He then testified: "I jumped up off of my feet and held the rifle on my hip and shot down towards the right considerably—not to hit any one." He later testified: "I shot to the right to keep from shooting towards the people that chunked the rocks and the cars in the drive-in-theater." He further testified that he did not see or hear any one in the direction in which he shot and in his opinion a boy with the physical description of deceased could not have been seen from the point the shot was fired, at the place deceased was shot, on the night of the shooting, due to the growth of bushes and weeds on the vacant lot.

There was testimony offered by the prosecution that appellant stated he observed the boys crawl back into the bushes prior to the time he fired the shot. Appellant denied making such a statement.

The evidence is without dispute that when the shot was fired by appellant the three small boys were lying in the bushes and the two older boys were at the end of the metal fence, some distance away.

During the trial of the case, the state toxicologist testified that he had visited the scene of the homicide on the night of January 13, 1953. He said that he was shown where the appellant allegedly stood

and the place where the deceased was when the shot was fired. His testimony included statements concerning the condition of the terrain, the existence of rag weeds and bushes on the vacant lot between appellant's garden and the theater exit road. On re-direct examination by the prosecution the following occurred:

"Q. Doctor, I will ask you if on that night standing at the smoke house—Did you stand at that smoke house? A. Yes, I did.

"Q. I believe you testified to Mr. Beddow on yesterday at a point pointed out by officer Tyree as being the spot where Mr. Neelley stood? A. Yes.

"Q. Did you stand at that point? A. I did.

"Q. Did you look from that point to the point as shown in State's exhibit 'A' as being where the boys were located on the night of November 26th? A. Yes.

"Q. Did you look with your naked eye or a miscroscopic instrument, or what? A. Naked eye.

"Q. Looked with your naked eye? A. Yes, sir.

"Q. Looking with your naked eye could you or could you not see in that area where the boys are shown in Exhibit A?

"Mr. Beddow: We object on the ground that it calls for irrelevant, incompetent and immaterial testimony; on the further ground that no proper predicate has been laid; no proper foundation has been laid; on the further ground that it is prejudicial. It is not shown that the circumstances are the same as on the 26th day of November; it is not shown that the under-brush and weeds were the same as they were on the 26th day of November; it is not shown that it was in the exact condition that it was in on the night of November 26, 1952, and would call for an illegal conclusion of what could have been determined on that night.

"The Court: Overrule the objection.

"Mr. Beddow: We except.

"Q. Doctor, if you remember the question, would you answer it? A. Yes, you could see across there and see the pool of light from the lights that illuminated the drive way to the theater.

"Q. These bushes there—were they on the east or the west of the lights? A. They were on the east of the lights.

"Q. Then I presume the lights were west of them? A. That is right.

"Q. If you saw an object as you say you did between the light and where you were standing by the smoke house, what is the type light that you would see in there? A. You would see them in silhouette—you would see the blackened outline of a person if there were a person there against the pool of light—behind it."

■ The rule of admissibility of evidence of an experiment made out of court is thus stated in Louisville & Nashville R. Co. v. Sullivan, 244 Ala. 485, 490, 13 So.2d 877, 880:

"Of course, there must be similarity of conditions to give an experiment sufficient probative value to warrant its admission, and if the conditions were dissimilar in an essential particular, the evidence should be rejected. But the authorities are to the effect that it is not necessary that the conditions should be exactly identical. A reasonable or substantial similarity suffices, and the lack of exact identity affects only the weight and not the competency of the evidence. It is for the court to determine whether the conditions are sufficiently similar to warrant admission of this proof, and much must be left to the sound discretion of the trial judge. 22 C.J. 759, 756; 32 C.J.S., Evidence, §§ 590, 587."

In 22 C.J.S., Criminal Law, § 645, pp. 985, 986, it is said that the general rule of

admissibility of such evidence "is subject to the limitations that the evidence must be such as to enlighten and must be such as to assist, rather than confuse, the jury, by directly illustrating and tending to establish or to disprove a material issue, and the experiment must have been fairly and honestly made under circumstances and conditions substantially similar to those attending the alleged occurrence." Our cases seem to support this text. Louisville & Nashville R. Co. v. Sullivan, supra; Atlantic Coast Line R. Co. v. Jackson, 225 Ala. 652, 654, 144 So. 813; Sherrill v. State, 138 Ala. 3, 15, 35 So. 129; Alabama Great Southern Railroad Co. v. Burgess, 114 Ala. 587, 596, 22 So. 169.

 It has been held, however, that the burden is upon the party offering evidence of an experimental observation to show similarity in the essential conditions at the time of the occurrence and at the time of the experiment. Spelce v. State, 20 Ala. App. 412, 419, 103 So. 694, certiorari denied 212 Ala. 559, 103 So. 705. On consideration of all the proof, we do not think the prosecution sustained this burden. It is our view, therefore, that reversible error was committed in receiving the testimony objected to, as above set out.

One of the material issues was whether appellant did, in fact, see the deceased and intentionally shoot him. The physical condition of the area lying between appellant and deceased at the time of the shooting had a direct bearing on this issue. If there were weeds or other objects obstructing appellant's view, the jury might reasonably conclude that appellant did not see the deceased and that the shooting of him was not intentional. Contra, if appellant's view was not obstructed. Hence, it is obvious that the true condition of the area at the time of the shooting was of vital importance in resolving the issue of intent. The evidence elicited from the state toxicologist, over appellant's pointed objection, was that on January 13, 1953, "you could see across there". But the shooting occurred on November 26, 1952, and we fail to find in the evidence a sufficient showing that the conditions on January 13th were "substantially similar to those attending the alleged occurrence" on November 26th.

While it might be true that some of the conditions existing at the time the state toxicologist conducted the experiment were shown by the evidence to be similar to those existing at the time of the killing, there appears to be no evidence indicating that the height, density, or condition of the weeds, bushes, and underbrush on the vacant lot, which separated the place where appellant stood and the place where deceased was at the time of the fatal shooting, was without material change on the date of the experiment. It is our view that the evidence of the experiment did not furnish, or aid in furnishing, a safe guide to the jury on the issue as to whether appellant did see, could have seen, or should have seen the deceased, since there was an absence of a sufficient showing of substantial similarity in conditions on the two occasions.

For the error noted, the judgment of the circuit court is due to be, and is, reversed and the cause is remanded.

Reversed and remanded.

SIMPSON, MERRILL and CLAYTON, JJ., concur.