[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1163 
Appellant was tried on an indictment charging murder in the second degree of D.C. Rusk. A jury found her guilty of manslaughter in the first degree and fixed her punishment at five years imprisonment. She was sentenced accordingly.
The deceased was killed by one bullet, from a .38-caliber Smith and Wesson handgun, that penetrated his left chest and was lodged in the front of his spine. Defendant was the only eyewitness to the killing, which occurred about midnight October 14-15, 1976.
According to the testimony of defendant and statements she made two or three hours after the killing and also about 9:00 o'clock that morning, she had been almost constantly with defendant from 4:00 or 4:30 o'clock the afternoon before the killing. They had been drinking considerably, he more than she. Each had a living and undivorced spouse. She had been separated from her husband. They drove around from place to place, then went to Leeroy Stewart's home near Grayson. They afterwards located Leeroy Stewart, who got into the pickup truck of the deceased with them. They went down an old road for several miles and Mr. Rusk made her undress so the Stewart boy could "make love" to her and she would not do it. The Stewart boy ran off. She then started driving the truck. After about an hour, the truck was stopped close to where Mr. Rusk was killed. This was in the area where her own car was parked. While there, Rusk got out of the truck, undressed, and got back in the truck with her. She was under the steering wheel and he was on the passenger's side of the seat of the truck. She had not been able to get her clothes back and was still undressed. They continued to drink. He asked her where the gun was. She said he had given her a gun for protection where she was living in a trailer. She told him it was in her purse. She reached in her purse with her left hand and when she brought out the pistol, he grabbed it and said, `I'll bet you don't even know how to cock it," and the gun went off. She testified he said, "Mamma, it's blowed my heart out."
Driving the truck, she attempted to get him to the hospital, but took him to the sheriff's office in Double Springs instead. She said that she had been fighting with Rusk at times that night, and there was *Page 1164 
evidence of bruises and scratches on her face and on Rusk's face; but she denied intentionally firing the pistol.
There was some evidence that she had threatened to kill Rusk on a previous occasion, but she emphatically denied it. Her testimony as to Rusk's having undressed her and attempting to get her to have a carnal affair with Stewart, much younger than either defendant or Rusk, was corroborated by the testimony of Stewart as a witness for the State.
Defendant strenuously objected to testimony by two State's witnesses as to the statements made by her about 3:00 A.M. the night of the killing and about 8:00 A.M. the same morning. The State showed conclusively that before the first statement was made, she had been given fully the Miranda warnings, that she freely and voluntarily waived her rights and made a statement as to what occurred. There is no contention to the contrary. Defendant contends that while the statement about 3:00 A.M. was being taken, defendant made it known to the officers that she wanted an attorney. However, according to the testimony of the officers, as to which there was little, if any, dispute, her reference to an attorney did not consist of a request for a lawyer, but was a conditional statement by her to the effect that if one of the officers wanted her to answer the question by him whether she had committed adultery with Rusk the night of his death, she wanted a lawyer. When interrogated about 8:00 A.M. by another officer, she was again advised fully of her rights, including her right to an attorney if she wanted one, at no expense to her, and she voluntarily told him what had occurred. The ruling of the court as to the statements made by defendant was as follows:
 ". . . My ruling was that the statement made by the defendant is admissible insofar as they were statements made prior to her statement in the 3:00 meeting which she did not want to answer any other questions until she had talked to a lawyer. I am ruling inadmissible any statements in the 3:00 meeting she may have made. And I am admitting the statements she made at the 8:00 meeting."
Counsel for defendant then stated:
 "We except severally (sic) and severally to the ruling on the 8:00 meeting and the ruling on the 3:00 meeting before she asked for a lawyer."
As to all of the statements of defendant admitted in evidence, she was acting voluntarily, understandingly, and with full awareness of her right to counsel which she had waived. The ruling of the court was not erroneous.
There was strong evidence that there was no gunpowder residue near the entrance hole of the bullet in the chest of Rusk.
State Toxicologist Kilborn testified as to tests made by him with the death weapon with live cartridges left therein and with similar cartridges. He said that according to the "tests and results in the laboratory the muzzle of the weapon would have to be 36 inches or greater to leave no gunpowder particles on the body." Defendant's objection to the question calling for such evidence was overruled, and appellant insists the evidence did not show "similarity in the essential conditions at the time of the occurrence and at the time of the experiment." He reasons thus because the evidence shows that the bullets in the test firing were fired into white paper. We recognize the possibility of there being some difference between the results of a test for powder residue when bullets are fired into white paper and when fired into human flesh; but certainly there is nothing before us to show that such possible difference invalidates the tests as a basis for the evidence of a proved expert in this particular field of science. Substantial similarity is sufficient, and, in the absence of dissimilarity in some essential particular, the lack of exact identity affects only the weight and not the competency of the evidence.Louisville Nashville R. Co. v. Sullivan, 244 Ala. 485,13 So.2d 877; Neelley v. State, 261 Ala. 290, 74 So.2d 436;Nichols v. State, 267 Ala. 217, 100 So.2d 750. In Nichols,267 Ala. at 224, 100 So.2d at 756, it was held: *Page 1165 
 "We are unwilling to say that the rule was not complied with in this instance. The pistol used in the test was the same pistol used in the fatal shooting. The ammunition fired in the tests was the same type of ammunition that was fired in the pistol at the time of the fatal shooting. The witness was an expert."
During the cross-examination of State Investigator Jerry Thomas, as a witness for the State, he was questioned as to statements made by defendant to him when he talked with her about 3 A.M. on the night of the homicide. He said that he had a tape recorder and recorded on the tape the conversation; and that the tape had been used again which caused an erasure of the taped conversation between him and defendant. The following then occurred:
 "Q You knew a case was going to be made out of this, didn't you?
"A Yes, sir.
 "Q And you knew the tape recording or tape might be important in this case, didn't you?
 "MR. SNODDY: We object to that, Your Honor, any further reference to this witness destroying evidence.
"THE COURT: Sustained.
 "MR. TWEEDY: We except. We will state this. I would not be asking questions if I did not think they were important.
"MR. SNODDY: We object to that, Your Honor.
 "MR. TWEEDY: Well, you said you didn't think I had grounds.
 "MR. SNODDY: That is highly improper. He is implying he had been told something outside the courtroom.
 "MR. TWEEDY: You said, you made the statement about me having some grounds. Well, I have grounds now. You do not have the tape that shows what was said and shows the tone of voices and how everybody was talking that night.
"THE WITNESS: No, sir, I don't.
"Q How long did you keep it before you taped over it?
"A Approximately a week.
"Q Where did you keep it?
"A At my office.
"Q Where is your office?
"A Hamilton, Alabama.
"Q Where?
"A Hamilton, Alabama.
"Q Hamilton?
"A Yes, sir."
Thus ended the cross-examination of the witness as to the tape recording and the taped conversation, and an extended cross-examination was commenced as to other matters.
Appellant urges as reversible error the action of the trial court in sustaining the State's objection as above noted. Although much discretion is vested in the trial court, cross-examination of a witness should not be unduly limited, especially when the interrogation is as to possible interest or bias of the witness, or his hostility, or ill will toward the party against whom he is testifying. Craven v. State,22 Ala. App. 39, 111 So. 767; Wells v. State, 292 Ala. 256,292 So.2d 471.
As the recorded colloquy in the case shows there was apparently some misunderstanding between counsel as to what counsel for defendant sought to develop by the particular question to the witness. It is not clear that he was attempting to show that the witness intentionally destroyed the recording of the conversation, but if so, any "yes" or "no" answer to the question would not have accomplished the purpose. It seems to us that defendant would not have gained anything by either an affirmative or a negative answer. Whether the trial court should have sustained the objection or not, the action of the court in sustaining the objection did not injuriously affect substantial rights of defendant, in our opinion.
Evidence was properly admitted on cross-examination of defendant that on previous occasions there had been fights between defendant and Rusk, as to which the court declined to allow the State to go into details. The admissibility of such evidence for the purpose of showing motive or malice of defendant toward deceased has been repeatedly *Page 1166 
upheld in homicide cases. Wright v. State, 279 Ala. 543,188 So.2d 272; Padgett v. State, 49 Ala. App. 130, 269 So.2d 147;McClendon v. State, 54 Ala. App. 327, 307 So.2d 723; Davis v.State, Ala.Cr.App., 331 So.2d 813.
In her direct examination, defendant testified she had been separated from her husband and was living in an entirely different neighborhood from where they had previously lived together. Other circumstances of her living separate and apart from him were shown on direct examination of her. On cross-examination, she was asked the reason for the separation. Defendant's objection to the question was overruled. Her answer was, "Because he knew I was seeing D.C." The answer does not disclose whether she was giving her husband's or her reason for separation, but appellant treats it as her reason in urging that the question "sought by the State to show that the defendant had left her husband because she wanted to go with D.C. Rusk, the deceased."
 "A defendant, after testifying, may be asked on cross-examination as to his motives or reasons for his particular acts shown in his direct examination." Patton v. State, 197 Ala. 180, 183, 72 So. 401, 402.
Appellant argues that the refusal of defendant's requested Charge No. 12, "If there is from the evidence a reasonable probability of defendant's innocence, the jury should find the defendant not guilty," constitutes reversible error. He relies upon Huguley v. State, 4 Ala. App. 29, 58 So. 814, which held that substantially the same charge was erroneously refused. However, subsequent cases make it clear that where the jury is fully charged on the subject of reasonable doubt and moral certainty, and the meaning thereof, such instructions are more rigorous and more favorable to defendant than a charge requiring the exclusion by the evidence of a reasonable probability of innocence and that the refusal of such a charge does not constitute error. Edwards v. State, 205 Ala. 160,87 So. 179; Russo v. State, 236 Ala. 155, 181 So. 502; Carroll v.State, 36 Ala. App. 59, 52 So.2d 171; Petty v. State,40 Ala. App. 151, 110 So.2d 319, cert. denied 269 Ala. 48,110 So.2d 325; Gardner v. State, 40 Ala. App. 276, 111 So.2d 916. In the instant case, the court fully covered the principle that a guilty verdict could not be returned unless the evidence established defendant's guilt beyond a reasonable doubt and to a moral certainty. It follows that there was no error in the refusal of Charge No. 12. For the same reason, the court was not in error in refusing other "probability" or "reasonable probability" charges requested (Charges 6 and 18).
Charge No. 7 was defective in form by reason of the language "even when." It is subject to the same criticism as the "even though" and "even should" charges, or the like, which have been held to have been refused without error. Blair v. St.Margaret's Hospital, 285 Ala. 636, 640, 235 So.2d 668;Louisville N.R. Co. v. Parker, 223 Ala. 626, 646,138 So. 231, cert. granted 286 U.S. 535, 52 S.Ct. 496, 76 L.Ed. 1275, cert. dismissed 287 U.S. 569, 53 S.Ct. 94, 77 L.Ed. 501;Manistee Mill Co. v. Hobdy, 165 Ala. 411, 417, 51 So. 871, 138 Am.St.Rep. 73. In Louisville N.R. Co. v. Parker, it was said that the word "even" carried with it an intimation against the supposition, and in Manistee Mill Co. v. Hobdy, it was said that the word "even" entertained an intimation that it was the court's opinion that it was not probable that the jury would find in accordance with the hypothesis that immediately followed the quoted word.
Appellant complains of the refusal of requested written charge XI, stating, "that the defendant is not being tried for adultery and you cannot convict her in this case because of the fact, if it be a fact, that she and D.C. Rusk had committed adultery." As much as the relationship between defendant and deceased became a matter of evidence, comment and argument in the case, never at any time was there any basis for any notion by any juror that defendant was not being tried for killing D.C. Rusk or that she was being tried for committing adultery with him. The requested instruction contained no principle of law *Page 1167 
and insofar as the province of the jury was concerned contained nothing more than an idle statement. Its refusal was proper.
Refused charges on the matter of reasonable doubt and the necessity for a unanimous agreement before defendant could be convicted were fully and adequately covered by given written instructions or in the oral charge of the court. They were refused without error.
Appellant's able counsel admirably argues that defendant was entitled to the requested general affirmative charges in her favor, that the court should have granted defendant's motion to set aside the verdict prior to her sentence and that it erred in overruling defendant's motion for a new trial. That the evidence was sufficient to present a jury issue as to her guilt, we have no doubt; that the death of Rusk was accidental, as contended by defendant, is entirely possible, but a conclusion to the contrary is not so unreasonable as to justify an interference with the finding of the jury; that the verdict finding defendant guilty of an intentional but a non-malicious homicide is indicative of the resolution of any and all doubt in favor of defendant; and that the fixation of punishment midway between the lower and upper limits is probably the reflection of a favorable response to the strong appeal of counsel for his client to the end that justice was tempered with mercy.
In addition to our consideration of all the questions raised by appellant, we have searched the record for error prejudicial to defendant and have found none. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the New Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment below is hereby
AFFIRMED.
All the Judges concur. *Page 1332