Jackie Dale Atchley was indicted and convicted of the first degree murder of James Eddie Powell "by stabbing him with a knife," and his punishment was affixed at imprisonment in the penitentiary for life. § 13-1-70, -74, Code of Alabama 1975. His subsequent motion for a new trial having been overruled by the trial court, Atchley now brings this appeal, urging the existence of several errors in the conduct of this trial below, thus urging reversal of this cause. We do not agree and affirm for reasons which follow.
After Mrs. Maggie Clay testified as to seeing her deceased son, James Eddie Powell, at a Birmingham funeral home, the State called Jay M. Glass, the Chief Medical Investigator for Jefferson County, who stated that he had performed an autopsy on the body of James Eddie Powell on the morning of July 29, 1979. Mr. Glass testified that Powell's body exhibited signs of recent surgery and also displayed the presence of four stab wounds, one in the upper shoulder, two in the left side of the chest, and one in the abdomen. Of the four wounds, Mr. Glass testified that three were fairly superficial, but the fourth penetrated Powell's heart. In the witness' opinion, death resulted from shock and hemorrhage attendant to the multiple stab wounds.
At this point in the testimony, a hearing was conducted outside the presence of the jury concerning a motion to suppress made by appellant in connection with a knife which had been seized from his person. As we will examine the circumstances surrounding appellant's arrest and the discovery of the knife in other portions of this opinion, we will not do so here. The trial court, after hearing the evidence on the motion to suppress, overruled it and admitted a knife, seized from appellant, into evidence.
After the hearing out of the jury's presence, Mr. Glass resumed his testimony before the jury and identified a knife in evidence as being capable of causing wounds consistent with those observed on the body of James Eddie Powell.
Under cross-examination, Mr. Glass testified that he had had many occasions to examine injuries inflicted by blunt objects, and that in his opinion a pool ball, if thrown or used to beat a person, could be a potentially deadly instrument.
Steven W. Adherholt testified on direct examination that he had been present at the Little Bombers Lounge in Birmingham between approximately 6:00 and 8:00 p.m. on July 28, 1979, and that he and a friend had been seated at a table in a second floor poolroom, drinking beer. Adherholt, who stated that he did not know appellant personally, identified him in open court, but was unable to say for sure if he had seen him at the lounge on the night in question. The witness testified that he observed an argument between a white male, described *Page 1036 
as heavy-set and with blond hair drawn into a ponytail, and a black male, who Adherholt heard to say, "`If you don't like something, change it'" (R. 65). The witness could not remember further conversation between the two, but stated that he was sure further words had been exchanged. During the argument, the black male and white male were standing, facing each other with about three feet of distance between them, near a pool table. At one point, Adherholt stated, the black male picked up two pool balls and then threw them at the white male as the white male advanced on him, striking him once in the face, after which fighting began between the two. Adherholt was unable to say who then struck who first, and testified that he did not observe any weapons other than a pool cue being wielded by an unidentified person. The witness stated that the two then went down the stairs to the first floor still fighting, but Adherholt did not see the black male get stabbed and did not know at the time that he had been injured.
Adherholt testified on cross-examination that, besides him and his friend, and the white male and black male, there had been several others present on the second floor at the time of the fight, including another black male apparently accompanying the black involved in the fight, which he termed to be a "pretty rough" one. He further stated that he did not know anyone named Chris Parks, but was familiar on a first name basis with a Tony Mickle, who he stated he saw at the lounge that night, but not on the second floor.
Victor Rex Woodward testified that he had accompanied Steve Adherholt to the Little Bombers Lounge on the night of July 28, 1979, and had witnessed an argument between a white male, who he described as having blond hair drawn into a ponytail, a brown moustache, and overalls and a tee shirt on, and a black male, who, in the witness' opinion was either nearly the same size or a little bigger than the white male. Woodward was unable to identify appellant as the white male involved in the argument. He further stated that, although he observed the two arguing, he could not tell what the argument was about and did not see any blows struck upstairs because he chose to go downstairs to avoid trouble. While downstairs, Woodward testified, he saw a black male leap from the second floor balcony, knock down an overhead chandelier and fall to the first floor, while another black and a white came down the stairs fighting. When the two reached the first floor, they separated, and the black male went to a pool table and picked up some pool balls, which he then dropped. At this point, Woodward stated, the black male walked over near the door to the lounge and fell down, bleeding from a wound in the abdomen area. The witness further stated that he saw the white male holding a knife with a blade similar to that of the knife in evidence.
On cross-examination, Woodward stated that he had seen Tony Mickle in the lounge, but was not sure whether Mickle had been upstairs at any point. He further stated that the black male, who had jumped from the second floor balcony, had then run out of the door to the lounge.
Tony Ray Mickle stated that he had accompanied the deceased, James Eddie Powell, to the Little Bombers Lounge on the night of July 28, 1979, but had remained outside the lounge for a period of time talking to a girl while Powell had gone inside. At some point later in the evening, Mickle testified, a girl had come outside the lounge screaming about a fight, and Mickle went inside in time to see Powell and two others coming down the steps to the second floor. As Powell reached him, Mickle stated, he told him "`He has got a knife'" (R. 109), and Mickle then saw appellant holding a knife and running out the door accompanied by another person. Powell then passed out, and Mickle took him to a hospital. The witness further testified that Powell had come down the stairs first, followed by two white males with long hair and overalls. One had dirty blond hair and the other had black hair. Mickle then identified the latter as an individual named Parks and the former as appellant, who had been brandishing the knife that night. He also stated that he had identified appellant later on the night in question at the city jail. *Page 1037 
On cross-examination, the witness stated that, in his opinion, Powell had been "big," but he denied having said that Powell first attacked appellant. Mickle also stated that Powell, while downstairs in sight of him, did not pick up any pool balls from a pool table. He further testified that he had had a lot to drink that night and might have struck appellant at some point, although he was not sure, and further that he was somewhat unsure about whether appellant was the same person who had been at the lounge because of his changed appearance. Mickle finally stated that he did not witness the stabbing itself, nor did he see any pool balls thrown.
Michael Christopher Parks stated that he and appellant had gone to the Little Bombers Lounge on the night of July 28, 1979, and had been drinking beer in the upstairs poolroom. Parks testified that at some point a black male began throwing pool balls at appellant, but that he had not witnessed any prior argument between the two. In Parks' estimation, three or four balls were thrown in rapid succession with one hitting appellant, and he stated that he himself was hit by something, although he did not know what. At that point, Parks went down the stairs and then witnessed the black male, who had been throwing the balls, downstairs as well, apparently hurt. He stated that he and appellant then left the lounge together, and that appellant was holding his head and saying "`What got all that started?'" (R. 136). Parks stated that he never saw any knife in the possession of appellant. He then testified as to the circumstances of appellant's arrest, which will be explored below, and thus will not be dealt with here.
Paul Yarbrough, a Tarrant City police officer, testified that, on July 28-29, 1979, he had been employed with the Birmingham Police Department and had been on routine patrol in the downtown area of Birmingham. Officer Yarbrough then testified to the circumstances of appellant's arrest and identified the knife which he had removed from appellant at the time of his arrest, and which he had turned over to a Sergeant Gaut.
Kevin Noppinger, a serologist with the State Department of Forensic Sciences, testified that, on October 10, 1979, he had received a knife from Sergeant William Gaut and had analyzed the blade of the knife for the presence of blood or other body fluids. His tests disclosed the presence of Type A human blood on the blade.
On cross-examination, Mr. Noppinger testified that he received a vial of blood, identified as coming from James Eddie Powell, from Chip Walls, a toxicologist. Mr. Noppinger stated that the blood type of the blood specimen was A.
At this point, Sergeant William T. Gaut of the Birmingham Police Department was examined outside the presence of the jury concerning a certain oral statement made by appellant to Gaut while appellant was in custody on July 29, 1979. As we will examine this testimony below we will not do so here. Sergeant Gaut testified concerning this statement before the jury as well, the court having overruled appellant's objections to it, and further described appellant as having at the time long hair, a full beard and moustache. Sergeant Gaut further stated that he received a knife from Officer Yarbrough, and subsequently turned it over to Kevin Noppinger; according to the officer it exhibited a red stain on the blade. He also testified that he received articles of clothing, consisting of a shirt and a pair of overalls, at the reception area of the city jail.
The State then rested, and the trial court overruled appellant's motion to exclude the State's evidence for failure to show a prima facie case.
The first witness called on behalf of appellant was Charles C. Robey, a deputy coroner-medical examiner for Jefferson County, who testified that he delivered blood samples from the body of James Eddie Powell to an employee of the State Department of Forensic Sciences.
Chip Walls, a forensic toxicologist with the State Department of Forensic Sciences, testified that he received blood samples marked with Charles Robey's initials from *Page 1038 
an employee of his department, and that the samples were from the body of James Eddie Powell. Analysis of this blood revealed the presence of .13 per cent ethyl alcohol, which Mr. Walls testified would represent a significant impairment of a person through intoxication, and Methaqualone in an amount less than that required to induce a "hypnotic state." In the witness' opinion, this combination of alcohol and Methaqualone could be expected to produce effects on a person's judgment and mental operations.
Tony Ray Mickle was recalled and testified that James Eddie Powell's reputation in the community for peacefulness was "bad." On cross-examination, Mickle stated that he did not recall seeing any other black males in the Little Bombers Lounge on the night of Powell's death.
Appellant then took the stand in his own defense and testified that he had earlier pled guilty to grand larceny. He stated that he went to the Little Bombers Lounge on the night of July 28, 1979, with Chris Parks and another, and was engaged in talking to various people and drinking beer on the second floor of the lounge when a black male suddenly threw a pool ball at him, striking him in the head. Appellant testified that he fell down as a result of the blow but saw the black male advancing toward him with another pool ball, at which point appellant "jumped at him" and stabbed him, possibly twice. The black male then went downstairs, and appellant followed, confronting at that time Tony Mickle and the black male whom he had stabbed. The wounded male, James Eddie Powell, then grabbed some more pool balls, and appellant stabbed him again. Powell fell to the floor, and appellant escaped out the front door.
On cross-examination, appellant denied talking to Sergeant Gaut. He further stated that the black male had commenced throwing the pool balls for no apparent reason. After the incident, appellant ran around to the rear of the building where he was picked up by Chris Parks. Appellant stated that he was not intoxicated, but did not know where he and Parks were when they ran out of gas. Appellant further testified that he had been charged with grand larceny and escape, and had been dishonorably discharged from the United States Marines after being charged with desertion. He stated that he had lost weight since the night of the stabbing, and had had longer hair fixed in a ponytail, a beard, and overalls on on the night in question. At this point the defense rested.
 I
The first, and a major, issue on this appeal is whether the trial court committed reversible error in overruling the appellant's motion to suppress evidence of the alleged murder weapon, a knife, seized by police officers from appellant during the process of his arrest for public drunkenness on the night of the stabbing. Our review of the circumstances leading to the admittedly fortuitous recovery of this particularly incriminating piece of evidence reveals that the knife was not the product of an illegal search, and thus was correctly received into evidence by the trial court.
The facts attendant to this particular question were developed through testimony received both during a suppression hearing outside the presence of the jury, and during the trial itself. The sole witness for the State to cast any light on the events surrounding appellant's apprehension was Paul Yarbrough, who, at the time of the fatal stabbing and appellant's arrest, had been a patrol officer with the Birmingham Police Department. Yarbrough testified that, on the night of July 28-29, 1979, he and another officer had been on routine patrol in their assigned area of downtown Birmingham when, a little after midnight, they spotted a black 1976 Chevrolet Malibu parked on the side of Eighteenth Street North, just north of that street's intersection with Fourth Avenue. Yarbrough admitted that the car was legally parked, with its lights off, and it is evident that the officers did not at the time possess any knowledge of any recent criminal activity in the area or of the stabbing at the Little *Page 1039 
Bombers Lounge, although Yarbrough said that there were "several businesses, clothing stores" in proximity to the parked car. As Yarbrough and his partner neared the parked vehicle, they noticed another person or persons standing on the southwest corner of the intersection of Eighteenth Street North and Fourth Avenue, but Yarbrough stated that neither he nor the other officer stopped, questioned, or otherwise investigated them. Instead, after parking their patrol car next to the Malibu, Yarbrough and his partner both exited their vehicle and approached the other car, which they noticed to contain a single occupant, later identified as appellant, apparently asleep in the driver's position behind the steering wheel. What occurred next is somewhat unclear from Yarbrough's combined testimony, but in essence it appears that the officer "asked [the appellant] if he was having some kind of problem, and Itold him to let me see some kind of identification" (R. 28-29) (Emphasis supplied.)
At another point in his testimony, Yarbrough stated that he "shook him and woke him up" (R. 143). At this, appellant "sat up and looked around and opened the car door and got out" (R. 29), all the while apparently attempting to reach his billfold in his back pocket. Evidently, Yarbrough did not order appellant out of the car, although at times he did testify that he "got him out of the car" (R. 38, 40, 41), but instead appellant exited the car of his own volition.
Once out of the car and on the sidewalk, appellant produced his driver's license, but was either not "responsive" to the officers' questions (R. 30), or "very vague about where he had been and what he was doing there" (R. 41). According to Yarbrough, appellant's eyes were somewhat bloodshot, his speech "slurred, somewhat slurred" (R. 30), there was the odor of alcohol about him, and he was unsteady on his feet (although he was apparently able to walk around to the rear of the car [R. 44]). The officers decided at some point to place appellant under arrest for public drunkenness as defined in the applicable Birmingham ordinance, although Yarbrough acknowledged that appellant was somewhat placid in his behavior. The next sequence of events is similarly unclear, in that Yarbrough testified that he "patted down" appellant, and thereby discovered a knife which exhibited stains consistent with dried blood in appellant's front pocket where there had earlier been a "bulge" (R. 31). The testimony of Yarbrough seems to establish that the "pat-down" was effected after appellant's initial arrest for public drunkenness as appellant was "fumbling" in his front pockets (R. 31, 144), and in any event the charge of carrying a concealed weapon was added to that of public drunkenness. Yarbrough stated that he and his fellow officer then examined the blade of the knife and decided to determine whether there had been any stabbings or similar incidents that evening, at which time they were made aware of the stabbing at the Little Bombers Lounge.
Chris Parks testified as the sole witness for the defense at the suppression hearing, and in essence stated that he and appellant had been at the Little Bombers Lounge on the night of July 28, 1979, and had consumed "a pitcher or two" of beer before leaving in Parks' car for a friend's house some distance away. Parks testified that, during the course of this trip his car ran out of gasoline, and Parks had to coast the vehicle to a halt on the side of Eighteenth Street North. From there, he and appellant walked to a pay telephone about a half-block away at the Fourth Avenue intersection to call for assistance, but when help failed to arrive appellant returned to the parked car and apparently went to sleep while Parks continued to call. From his vantage point at the telephone, Parks stated, he noticed a police car with its lights off pull to a stop by his car, and two officers "got out and got Jackie, the defendant there, out of my car" (R. 47). Later in the trial, Parks stated that the officers "made him get out" (R. 139). According to Parks, this occurred within some forty-five to fifty minutes after they had left the Little Bombers Lounge.
The trial court overruled appellant's motion to suppress based upon this testimony, *Page 1040 
apparently concluding that, since appellant had left the parked car voluntarily, the arrest for public drunkenness had been proper and the knife had been seized as an incident thereto. We find, however, that this situation presents the potential application of at least one more theory of police activity involving the Fourth Amendment, that of "stop and frisk," and, as exactly what transpired between the officers and appellant on the night in question is somewhat unclear from the testimony elicited at trial, we feel it necessary to examine both lines of argument.
The initial contention advanced by appellant is that the actions of the police officers in approaching him as he slept in the parked car, and in then questioning him concerning his identity and activities that night amount to a "stop" and thus a seizure of his person, and as such was not based upon any articulable circumstances which reasonably indicated that he was involved in any criminal conduct. This would in turn, he asserts, act to taint the subsequent procedures and actions of the officers by which appellant was eventually arrested for public drunkenness and the incriminating knife discovered. The State, on the other hand, argues that the initial contact between the police and appellant was not a "stop" or seizure in the first place, and thus not within the ambit of the Fourth Amendment, but that even if it was, there were sufficient facts available to the officers from which they could have reasonably concluded that appellant was engaged in some criminal activity, and possibly armed with a dangerous weapon, i.e., the knife. We conclude that, based upon these circumstances, the notion of "stop and frisk" cannot be a justification for the actions of the officers here in that there was, initially, no "stop," and even if there was activity possibly amounting to such a "stop" there were no circumstances to justify it.
That the intrusion on the sanctity of the person inherent in the "stop and frisk" procedure, albeit usually somewhat minor when considered relative to permissible actions attendant to a full-scale arrest on probable cause, is outside the realm of protections afforded by the Fourth Amendment's proscription against unreasonable searches and seizures was "emphatically reject[ed]" by the Supreme Court in Terry v. Ohio, 392 U.S. 1,88 S.Ct. 1868, 20 L.Ed.2d 889 (1968):
 "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has `seized' that person. And it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a `search.'"
392 U.S., at 16, 88 S.Ct., at 1877. In Terry, an experienced police officer had witnessed the actions of a small group of men for a period of time and had concluded from what he had seen that the group was preparing to rob a nearby business establishment. He therefore approached the men and questioned them concerning their activities, and upon receiving less than satisfactory answers to his inquiries proceeded to grab Terry, a member of the group, and quickly "frisk" him, thereby locating a concealed pistol. The Court, in upholding the actions of the officer, held that such stops of suspicious persons "short of something called a `technical arrest'" must be governed by the "reasonableness" clause of the Fourth Amendment, and might be accomplished on something less than the traditional probable cause required for a full arrest.392 U.S. at 19-20, 88 S.Ct., at 1879. The majority opinion in Terry did, however, indicate that "obviously, not all personal intercourse between policemen and citizens involves `seizures' of persons," instead restricting the notion of a Fourth Amendment "seizure" in such instances to "only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. . . ." 392 U.S., at 19,88 S.Ct., at 1879, n. 16. On the facts of the case, the Court determined that a seizure of Terry had occurred at least at the point the officer grasped Terry in order to "frisk" him, but it refused to analyze the *Page 1041 
prior activity of the officer, i.e., his initial approach and questioning of the group of men, noting that "we cannot tell with any certainty upon this record whether any `seizure' took place" and thus assuming that prior to the point of actual physical contact between the officer and Terry, no seizure had occurred. 392 U.S. at 19, 88 S.Ct., at 1879, n. 16.
The concurring opinions in Terry are perhaps of more importance in regard to the issue with which we are here presented. Thus, Justice Harlan noted that a law enforcement officer has "the liberty (. . . possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away. . . ." 392 U.S., at 32-33, 88 S.Ct., at 1885-1886, although he acknowledged that this "right" to address a citizen did not, in and of itself, justify an officer in forcibly stopping a subject and frisking him for weapons absent any constitutional justification for doing so. Similarly, Justice White stated that "[T]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets," although he too recognized that a "stop" as envisioned in Terry was beyond a mere contact and therefore subject to stricter constitutional justification.392 U.S., at 34, 88 S.Ct., at 1886.
One of the companion cases to Terry, Sibron v. New York,392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), similarly involved a somewhat summary "stop and frisk" after an unclear initial encounter prompted by a police officer's entering a restaurant where Sibron was and beckoning him to accompany the officer outside. The Court was, as in Terry, somewhat undecided as to how to treat the action of the officer in summoning Sibron outside in the first place:
 "We are not called upon to decide in this case whether there was a `seizure' of Sibron inside the restaurant antecedent to the physical seizure which accompanied the search. The record is unclear with respect to what transpired between Sibron and the officer inside the restaurant. It is totally barren of any indication whether Sibron accompanied Patrolman Martin outside in submission to a show of force or authority which left him no choice, or whether he went voluntarily in a spirit of apparent cooperation with the officer's investigation."
392 U.S., at 63, 88 S.Ct., at 1903. Terry and Sibron make it quite evident that, while activities of law enforcement authorities which fall short of a traditional arrest on probable cause might fall within the Fourth Amendment, certainly not all forms of contact between officers and citizens were intended to be cast as "seizures" invoking Fourth Amendment scrutiny.
The most recent pronouncement of the Court on the precise issue of whether a seizure has in fact occurred is found inUnited States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870,64 L.Ed.2d 497 (1980), a plurality decision in which the Court overturned the Sixth United States Circuit Court of Appeals' reversal of a drug possession conviction. It appeared that the defendant had alighted from a passenger airliner at the Detroit airport and was then observed by two agents of the Drug Enforcement Administration [DEA], who had noticed that defendant exhibited characteristics consistent with a DEA drug courier "profile." At some point, while defendant was walking through the airport terminal, the two agents approached her, identified themselves, and asked to see her ticket and some identification, which defendant then produced. Upon finding that the names on the ticket and identification did not match, and after defendant failed to satisfactorily explain the discrepancy, the agents asked her to accompany them to a nearby DEA office, where they then asked her if she would consent to a search of her person and effects. The defendant apparently complied, and in the ensuing search, narcotics were discovered. As a part of its ruling, the Court expressly determined that the initial approach of and questioning by the agents had not constituted a "seizure" within the mandates of Terry andSibron, supra: *Page 1042 
 "We adhere to the view that a person is `seized' only when by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but `to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' United States v. Martinez-Fuerte, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.
 "Moreover, characterizing every street encounter between a citizen and the police as a `seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws."
446 U.S., at 553, 100 S.Ct., at 1877. Thus, the Court determined, an objective "test" should be applied in such cases in order to decide the question of whether a person could have believed he or she was free to leave and thereby ignore an officer's inquiries:
 "We conclude that a person has been `seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person."
446 U.S., at 554, 100 S.Ct., at 1877. On the facts before it, the Court concluded that "respondent was not seized simply by reason of the fact that the agents approached, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official." 446 U.S., at 555, 100 S.Ct., at 1877. In reaching this decision, the Court reasoned:
 "Our conclusion that no seizure occurred is not affected by the fact that the respondent was not expressly told by the agents that she was free to decline to cooperate with their inquiry, for the voluntariness of her responses does not depend upon her having been so informed . . . We also reject the argument that the only inference to be drawn from the fact that the respondent acted in a manner so contrary to her self-interest is that she was compelled to answer the agents' questions. It may happen that a person makes statements to law enforcement officials that he later regrets, but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily."
446 U.S., at 555, 100 S.Ct., at 1878.
We find that the Mendenhall objective test is by no means a new one, and has been formulated and applied by lower courts in varying factual settings where the issue of whether a "stop" or seizure had occurred at a point in time exists. The Fifth Circuit decision in United States v. Elmore, 595 F.2d 1036 (5th Cir. 1979), on facts strikingly similar to those present in theMendenhall case, held that the approach of two DEA agents and their identification to Elmore as federal officers did not amount to a seizure of Elmore: *Page 1043 
 "The initial encounter was not precipitated by force. There was no physical contact. The only show of authority occurred when the agents initially approached Elmore and identified themselves as federal law enforcement officials. Such identification is insufficient to convert an encounter, otherwise regarded as outside the purview of the Fourth Amendment, into a Terry stop . . . The tone of the conversation as well as the events that ensued also indicates that Elmore was not compelled to continue with the encounter."
595 F.2d, at 1042.
In Coates v. United States, 413 F.2d 371 (D.C. Cir. 1969), police officers who had received a report of a robbery and descriptions of the assailants confronted subjects meeting the descriptions working on a car in an alley near the scene of the incident, which had occurred some twenty-five minutes prior to the encounter. The officers approached the two and "asked . . . what they were doing, to which they replied that they were trying to start the car." 413 F.2d, at 372. Certain incriminating evidence was then spotted by the officers lying in open view in the car, and the subjects were eventually arrested. The Court of Appeals, in affirming the conviction, rejected the contention that appellant Coates and his companion had been "arrested" or seized at the point that the officers first approached the car, holding that, despite the subjective fears of appellant that he was going to be arrested, "`the test must not be what the defendant himself * * * thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.'" 413 F.2d, at 373, quoting from United States v. McKethan, 247 F. Supp. 324 (D.D.C. 1965),affirmed by order, No. 20,059 (D.C. Cir. 1966). The Court thus concluded that "since neither through physical force nor through a show of authority nor implied restraint had the police impeded Appellant's liberty," there had been no seizure by the mere initial approach of the police. 413 F.2d, at 374.
Similarly, in United States v. Wylie, 569 F.2d 62 (D.C. Cir. 1977), cert. denied, 435 U.S. 944, 98 S.Ct. 1527,55 L.Ed.2d 542 (1978), a police officer had observed an unsuccessful attempt by defendant Wylie to withdraw money from a bank, and had then witnessed him exit the bank in a rapid manner upon seeing the officer watching him. The officer proceeded to follow him, and, upon catching up to him, asked him if he could talk to him, and further requested identification, which Wylie could not produce. The officer then requested that he be shown the bank withdrawal slip which Wylie had used in his attempt to withdraw the money. The District of Columbia Circuit held that the initial encounter between Wylie and the officer outside the bank had been a mere "contact" and not a "stop" or seizure:
 "Clearly, no physical force or physical contact of any kind was used to restrain appellant's freedom of movement. And, although a refined judgment is required, we believe that an innocent person in appellant's position would not have felt compelled to respond affirmatively to the officer's request for information. The tone of Officer Franck's question — `Sir, may I talk to you a moment?' — strongly suggests that appellant was free to leave if he so desired, and nothing in his response indicates to the contrary."
569 F.2d, at 68.
Our review of the case law of other states on this point reveals that there are a number of decisions which have found that the actions of police officers in merely addressing questions and perhaps requesting identification of persons on the streets do not amount to "stops" or seizures within the ambit of the Fourth Amendment. Cf., State v. Vohnoutka, Minn.,292 N.W.2d 756 (1980); State v. Johnson, R.I., 414 A.2d 477
(1980); People v. Privott, 411 N.Y.S.2d 711, 66 A.D.2d 951
(1978); State v. Porter, 31 Or. App. 229, 570 P.2d 111 (1977);State v. Foster, 269 S.C. 373, 237 S.E.2d 589 (1977); People v.DeBour, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976);People v. Rudasil, 386 N.Y.S.2d 408, 53 A.D.2d 541 (1976);People v. Dembinski, 62 Mich. App. 583, 233 N.W.2d 662 (1975); *Page 1044 State v. Tsukiyama, 56 Haw. 8, 525 P.2d 1099 (1974); People v.McGarry, 10 Ill. App.3d 570, 294 N.E.2d 718 (1973); People v.Priest, 9 Ill. App.3d 499, 292 N.E.2d 518 (1972). On the other hand, a separate line of cases which have addressed the issue have concluded in varying factual situations that a seizure did occur, especially where an officer took some steps (whether through production of a weapon, or an authoritative tone of voice, or the like) to assure that the subject stopped and complied with the officer's request that he answer some questions or produce identification. Cf., State v. Bolden,380 So.2d 40 (La. 1980); State v. Tucker, 286 Or. 485,595 P.2d 1364 (1979); United States v. Palmer, 603 F.2d 1286 (8th Cir. 1979); Wilder v. Superior Court of Tulare County, 92 Cal.App.3d 90,154 Cal.Rptr. 494 (1979); Dolan v. Golla, 481 F. Supp. 475
(M.D.Pa. 1979); People v. Spivey, 401 N.Y.S.2d 798,61 A.D.2d 740 (1978); Crowder v. United States, 379 A.2d 1183
(D.C. 1977); State v. Ochoa, 112 Ariz. 582, 544 P.2d 1097
(1976); People v. Allende, 39 N.Y.2d 474, 384 N.Y.S.2d 416,348 N.E.2d 891 (1976); Commonwealth v. Pignone, 3 Mass. App. 403,332 N.E.2d 388 (1975); State v. McKinley, 305 Minn. 297,232 N.W.2d 906 (1975); Curtis v. United States, 349 A.2d 469 (D.C. 1975); People v. Hassele, 83 Misc.2d 284, 372 N.Y.S.2d 349
(1975); State v. Baltier, 17 Ariz. App. 441, 498 P.2d 515
(1972); Holtzendorf v. State, 125 Ga. App. 747, 188 S.E.2d 879
(1972).
Our reading of the facts in the instant case leads us to the conclusion that appellant was not "stopped" or seized within the meaning of the Fourth Amendment and the above-cited authorities at the point when the officers approached him as he slept in the parked car and asked him for identification and questions as to his activities. There is no concrete indication that the officers physically pulled the appellant out of the car or grasped him in such a manner as to prevent him from leaving the scene. And, while the tone of Officer Yarbrough's voice is, of course, unclear from the record, it does appear that he was only requesting appellant to produce some identification, and explain why he was sleeping in a parked car on a downtown street after midnight. There were certainly no weapons produced by the officers, and indeed the only real show of authority by them appears to have been that they were dressed in their official uniforms. Under these circumstances, we hold that there was no "stop" or seizure, but a reasonable inquiry under the circumstances shown by this record. The fact that appellant apparently chose to comply, and thus got out of the car, instead of merely resuming his slumber in the confines of the car, does not, within the meaning of Mendenhall, negate this holding without further showings that he was compelled in some way to leave the car and comply with the officers' request.
United States v. Beck, 602 F.2d 726 (5th Cir. 1979), relied upon by appellant, is inapposite to the case here, as is the Supreme Court decision in Brown v. Texas, 443 U.S. 47,99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). In Beck, the Fifth Circuit recognized the problem at hand, but expressly concluded on the facts that Beck and his cohort had been restrained in their freedom to ignore the officers who had approached to question them: "By pulling so close to the Chevrolet, the officers effectively restrained the movement of Beck and his passenger." 602 F.2d, at 729. In Brown, officers had confronted the appellant in an alley and had requested identification and an explanation of Brown's activities in the alley, inquiries which Brown "angrily" rebuffed. As he attempted to walk away, he was forcibly detained by the officers, thus leading the Court to the conclusion that because of this detention, he had been seized for purposes of Fourth Amendment scrutiny. Here, as we find that appellant was not in any way compelled to either remain at the scene or comply with the officers' wishes, we do not deem either Beck or Brown controlling on this point.
Although we do hold that the initial encounter between appellant and the police was not a "stop" or seizure and thus not a subject of Fourth Amendment protection, we feel it necessary to further point out *Page 1045 
that had the actions of the officers amounted to such a "stop" it would have been unjustified under the circumstances. AsTerry and its progeny recognize, such a detention might be accomplished on less than traditional probable cause, but there must be a showing, at the minimum, that the officers had "a reasonable suspicion, based on objective facts, that the individual [was] involved in criminal activity." Brown v.Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357
(1979); Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391,59 L.Ed.2d 660 (1979); United States v. Brignoni-Ponce,422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). See, § 15-5-30, Code of Alabama 1975; Vogel v. State, Ala.Cr.App., (Ms. October 28, 1980). The State asserts that the following facts were sufficient to satisfy the test mandated by the above decisions:
 "1. He [Officer Yarbrough] spotted Appellant sitting in the parked car on the driver's side at 12:12 a.m. (R. 27, 142, 143).
 2. It was downtown in an area with businesses around (R. 28, 142).
 3. People were standing on a corner across from the Appellant (R. 36).
 4. As he contacted Appellant to ask if he had any problems, Appellant had his eyes closed and appeared to be asleep (R. 29, 143).
5. That he shook Appellant to wake him (R. 143).
 6. Appellant's person and car smelled of alcohol (R. 30, 39, 144).
 7. He asked defendant for identification (R. 29, 143)."
Brief of Appellee at 23. Admittedly, there were no reports of any crimes in the area that Yarbrough testified to, nor from the facts is it evident that appellant, by sleeping in a legally parked car on the side of a downtown street, was violating any ordinance or law, at least before Officer Yarbrough was close enough to smell the odor of alcohol about appellant. In view of our holding concerning the point of any seizure we need not belabor this point, but we do express the opinion that had the actions of the officers amounted to a seizure, such a seizure would have been illegal, as there existed no concrete facts tending to reasonably indicate that appellant was "involved in criminal activity."
 II
Our holding that no seizure occurred when the officers initially approached the parked car does not in any way obscure the obvious issue that appellant was ultimately "seized" by virtue of his arrest, and his person searched. There is some question as to exactly when the search itself took place during the above-described sequence of events, with Officer Yarbrough apparently first testifying that he had "patted down" appellant before his arrest, but later altering this version to indicate that he and his partner first arrested and then searched appellant. The trial judge appears to have considered the search as one incident to appellant's arrest for public drunkenness, and we feel that the evidence supports this treatment. We will, therefore, examine this issue along those lines. It is, of course, well-settled that a police officer may conduct a warrantless search of the person of a legally arrested subject for the presence of either a weapon which might be used against the officer, or evidence capable of surreptitious destruction. Sibron v. New York, 392 U.S. 40,88 S.Ct. 889, 20 L.Ed.2d 917 (1968); Michigan v. DeFillippo,443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); Foy v. State, Ala.Cr.App., 387 So.2d 321 (1980); Douglas v. State, Ala.Cr.App., 366 So.2d 373 (1979). The essential element of this tenet, however, is that the underlying arrest must have been a legal one, and thus an arrest which is, for whatever reason, illegal likewise renders the accompanying search illegal. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168,4 L.Ed.2d 134 (1959); Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223,13 L.Ed.2d 142 (1964). The point of our inquiry must therefore be whether, on these facts, the arrest of appellant for public drunkenness was proper.
By statute in Alabama a law enforcement officer may effect the arrest of a *Page 1046 
person for "[A]ny public offense committed or a breach of the peace threatened in his presence," § 15-10-3 (1), Code of Alabama 1975, and appellant does not seriously dispute this. Instead, we are necessarily confronted with whether the facts of this case adequately indicate that appellant had actually committed an offense at the time he was placed under arrest for drunkenness. Appellant was charged under the terms of Section 36-15 of the General City Code of Birmingham, Ala. (1964),[1]
which proscribes public intoxication:
 "No person shall, while intoxicated or drunk, appear in any public place, or at or within the curtilage of any private residence not his own, where one or more persons are present, and manifest a drunken condition by boisterous, noisy, disorderly or indecent conduct, or by rude or profane language or by staggering, falling or sleeping."
A comparison of this ordinance with the State public drunkenness statute found at § 13-6-14, Code of Alabama 1975, reveals that the two are, for the most part, identical in scope:
 "Any person who, while intoxicated or drunk, appears in any public place where one or more persons are present, or at or within the curtilage of any private residence, not his own, where one or more persons are present, and manifests a drunken condition by boisterous or indecent conduct or loud and profane discourse shall, on conviction, be fined not less than $5.00 nor more than $100.00, to be paid in money only."
It is clear from a reading of both of these sections that in order to demonstrate a violation of either provision, it must be satisfactorily shown that the accused was both intoxicatedand manifested his intoxication while in a public place in the presence of one or more persons by one or more of the acts enumerated in the respective sections. Mitchell v. State, Ala.Cr.App., ___ So.2d ___ (Ms. November 25, 1980); Plump v.State, Ala.Cr.App., 385 So.2d 1349, cert. denied, Ala.,385 So.2d 1351 (1980); Tatum v. State, 32 Ala. App. 128,22 So.2d 350 (1945); Huckabee v. State, 34 Ala. App. 288, 39 So.2d 43
(1949); Thompson v. State, 34 Ala. App. 608, 42 So.2d 640
(1949).
In the instant case, we find it fairly evident that the appellant was intoxicated at the time of his arrest, and indeed it was undisputed at trial that appellant had consumed between one and two pitchers of beer with Chris Parks earlier in the evening (Parks also stated that about forty-five to fifty minutes had elapsed between their departure from the Little Bombers Lounge and the arrest of appellant). Officer Yarbrough testified that, upon first approaching the parked car where appellant slept, he had detected the odor of alcohol emanating from the open window of the vehicle. He further stated that, when appellant got out of the car and stood on the sidewalk, he was somewhat unsteady, had bloodshot eyes and a slurred voice, and had trouble either responding to the officers' questions or locating his driver's license. Further, the odor of alcohol was even more apparent. There is no escaping the conclusion from these facts that appellant was intoxicated at the time he was arrested. Cf., Cassell v. State, 55 Ala. App. 502, 317 So.2d 348
(1975).
As the above-cited authorities indicate, however, mere intoxication is, in itself, insufficient to constitute the offense set forth in either § 36-15 or the statute, § 13-6-14, as those sections both require that the accused have manifested his intoxication in a public place before one or more persons. The acts which will indicate such a manifestation are variously described in the respective provisions and, for the most part, relate to boisterous or lewd and offensive conduct. It is obvious from a reading of the sections, however, that the Birmingham ordinance *Page 1047 
extends its definition of drunken behavior as proscribed by the section to include instances of "staggering, falling or sleeping," a difference which we have only recently held does not render the ordinance impermissibly inconsistent with the State statute. See Plump v. State, supra. Thus, for instance, while a showing that an accused merely "staggered" has been held to be insufficient to satisfy the requirement of proof under § 13-6-14, see Pettus v. State, 26 Ala. App. 347,159 So. 502 (1935), and Ingram v. Town of Heflin, 27 Ala. App. 44,165 So. 600 (1936), similar activity has been held sufficient in itself to show a violation of the Birmingham ordinance. Moon v.State, 48 Ala. App. 127, 262 So.2d 615 (1972). Our review of the testimony of Officer Yarbrough reveals that there was certainly no exhibition of drunken behavior by appellant under either section once he had gotten out of the car and was standing onthe sidewalk. In response to explicit questions as to whether appellant had displayed any boisterous or indecent behavior, Officer Yarbrough replied that for "other than sleeping" appellant had not acted intoxicated (R. 39). Further, we do not find any testimony that establishes that appellant was "staggering, falling or sleeping" while he was outside the car
(indeed, Officer Yarbrough only stated that appellant was somewhat unsteady on his feet, but he also testified that appellant was walking about, apparently without difficulty). It is thus our conclusion that the State did not adequately show that appellant manifested drunken behavior as required by either the ordinance or the statute while he was outside thecar.
This does not, however, dispose of this issue for Officer Yarbrough did state that, when he first approached appellant, appellant was asleep in the front seat of the car and he (Officer Yarbrough) could smell the odor of alcohol coming from the interior of the car. Under the terms of the Birmingham ordinance (but not, apparently, the State statute), "sleeping" would, if done while under the influence of intoxicants and in a "public place," satisfy the requirement that drunken behavior be manifested. Plump v. State, supra. While there is little doubt that appellant was intoxicated and asleep in the parked car when the officers first approached, we are confronted with determining whether the car, parked as it was in a legal parking place on the side of a downtown street, was a "public place" within the scope of the Birmingham section (or, for that matter, the State statute). It appears that our cases have not dealt directly with this construction of a "public place" as it appears in either the Birmingham ordinance or State statute, but Brown v. State, 38 Ala. App. 312, 82 So.2d 806 (1955), in construing a similar State statute dealing with intoxication of one "along the public roads and highways of this state," § 13-6-15, Code of Alabama 1975, seems to indicate that one cannot be convicted for public intoxication under the terms of § 13-6-15 if he or she had remained entirely within an automobile while on a street or road. See, also, Mechalske v.City of Trussville, Ala.Cr.App., 367 So.2d 197 (1979); Atkinsv. City of Tarrant City, Ala.Cr.App., 369 So.2d 322 (1979). This interpretation of § 13-6-15 seems quite proper given the express exception in that section relating to "passengers."
It seems clear to us, however, that in regard to the section before us here (either § 36-15 or Code § 13-6-14), an automobile parked on the side of a public street can certainly be a "public place" for purposes of determining the potential criminal liability of a person under the section. Given the obvious purpose of the statute as being not only to protect the intoxicated subject, but to afford the citizenry at large some protection against the usually offensive behavior and/or sight of an intoxicated person, it would be anomalous to allow the arrest of such a person who, while on a sidewalk, manifested drunken behavior, while at the same time prohibiting a similar arrest of a person seated in a parked car only a few feet away but exhibiting the same conduct in obvious view of passersby. We thus hold that a "public place" as provided in the Birmingham section, § 36-15, or in the State statute, § 13-6-14, embraces the *Page 1048 
automobile parked, as in this instance, on or near enough to a public thoroughfare to permit it to be open to public view by passersby. A similar result has been reached by the courts of other states as well. See, People v. Kelley, 3 Cal.App.3d 146,83 Cal.Rptr. 287 (1969); State v. Teas, 108 N.H. 485,238 A.2d 737 (1968); Miles v. State, 247 Ind. 423, 216 N.E.2d 847
(1966); People v. Belanger, 243 Cal.App.2d 654, 52 Cal.Rptr. 660
(1966); Berry v. City of Springdale, 238 Ark. 328,381 S.W.2d 745 (1964); Stateham v. State, 95 Okla. Cr. 232,243 P.2d 743 (1952).
By being intoxicated and asleep in the parked car, appellant was in obvious violation of § 36-15 of the Birmingham City Code, and it is thus clear that the police officers had the authority, if not the duty, to effect an arrest of appellant for violation of this ordinance. Because we find that the officers had probable cause to suspect that appellant was in fact violating the ordinance through his behavior inside the car, we do not deem it significant as to whether he was ordered out of the car at a subsequent time (our review of the evidence, however, indicates that this was not the case anyway). As the arrest of appellant was proper, the further actions of the officers in "patting" appellant down were clearly legal, and thus the knife properly seized. The trial court correctly overruled appellant's motion to suppress.
 III
Appellant raises several contentions regarding the admissibility of testimony concerning a statement which he made to a police investigator in the early morning hours after the stabbing incident while he was in custody for public drunkenness and carrying a concealed weapon. During testimony taken outside the presence of the jury, Sergeant William Gaut of the Birmingham Police Department testified that he had questioned appellant concerning the stabbing at the Little Bombers Lounge between 1:00 and 1:30 a.m. on July 29, 1979, after appellant's arrest, the discovery of the knife and his transportation to jail. The officer stated that, while it appeared to him that appellant had been drinking, he did not seem to be intoxicated when he was questioned. Sergeant Gaut further testified that he read appellant a statement of his rights from a Miranda[2] card, and when appellant was then asked if he understood those rights as read to him, "[H]e responded that he did" (R. 168). According to Sergeant Gaut, appellant was not offered any hope or promise of any type of reward, nor was threatened or coerced, or induced, in any fashion in exchange for his cooperation. Sergeant Gaut stated that appellant then asked him what it was Gaut wanted to ask him, and why he was under arrest, to which Gaut replied:
 "A. I told him I was investigating a homicide, that a black man had been killed at the Little Bombers Lounge at Five Points, South area, and I advised him that he was a suspect in the case, and I told him I wanted to ask him about his involvement and what he knew about that case." (R. 169)
The following exchange then occurred:
 "A. He replied to me, telling me that he knew nothing about it, that he had never been to any Little Bombers Lounge, or any lounge in Five Points South, and that he had been out with a friend, and he didn't know anything about what I was talking about, that he was not involved in any kind of homicide, and he had nothing further to say beyond that.
 "Q. He said that he had never been to the Little Bombers Lounge?
"A. Yes, sir.
"Q. That he had not gone there that night?
"A. No, sir.
"Q. Did he say what friend he was with?
 "A. No, sir. When he finished that, he told me that he had nothing further to say, and, so, there were no further questions." (R. 169-170)
The trial court overruled appellant's objections to the testimony by Sergeant Gaut *Page 1049 
concerning this statement, which was admittedly not transcribed or recorded, ruling that the officer could state what appellant had said before he chose to exercise his rights to terminate the questioning and remain silent. Appellant's objections to the statement, by which he denied complicity in the killing, stem from the inconsistency between that statement and his testimony at trial, where he admitted both his presence at the Little Bombers Lounge on the night in question and his role in the death of James Eddie Powell, an inconsistency which appellant claims "made [him] look like a liar" (Brief of Appellant at 17, 18).
Appellant argues that, because he ultimately chose to refuse to answer any more of Sergeant Gaut's questions, the statement which he made before exercising that right should have been excluded because it occurred during the same period of questioning. This argument is without merit under the circumstances of this case. In the seminal decision of Mirandav. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court stated that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."384 U.S., at 444, 86 S.Ct., at 1612. It is clear, however, that an accused may effectively "waive" the protections afforded under the Constitution as interpreted in Miranda, and choose to comply with requests for information or the like. This Court stated the following concerning such a waiver in Sullivan v. State, Ala.Cr.App., 351 So.2d 659, cert. denied, Ala., 351 So.2d 665
(1977):
 "While all extra-judicial confessions [or, for that matter, statements] are prima facie involuntary and can be rendered admissible only by showing that an `express and affirmative' waiver was given, there is no set pattern or manner for a waiver. Lloyd v. State, 45 Ala. App. 178, 227 So.2d 809 (1969). While a waiver will not be presumed simply from the silence of the accused after the warnings are given or simply from the fact that a confession was obtained, where the totality of the circumstances indicate that the confession was voluntary, a confession will not be excluded because the accused did not state that he understood his rights or did not sign a written waiver. "`Any clear manifestation of a desire to waive is sufficient. The test is the showing of a knowing intent, not the utterance of a shibboleth. The criterion is not solely the language employed by a combination of that articulation and the surrounding facts and circumstances.' Lloyd, 45 Ala. App. at 184, 227 So.2d at 814.
. . . . .
 "An inference of a waiver may be drawn from the making of a statement after warnings have been given and when the defendant was aware of his right not to speak. Mitchell v. United States, 140 U.S.App.D.C. 209, 434 F.2d 483, cert. denied, 400 U.S. 867, 91 S.Ct. 109, 27 L.Ed.2d 106 (1970)."
351 So.2d, at 664. On the facts of this case and through application of the above-stated principles, we find it apparent that appellant effectively waived the protection of his Miranda
rights in as far as he denied his complicity in the Powell killing to Sergeant Gaut before choosing to remain silent thereafter. It is clear from the record that Sergeant Gaut read appellant his rights from a card, and in fact that the contents of that card were read during Gaut's testimony at trial. Among other things, that card stated:
"`1. You have the right to remain silent.
. . . . .
 "`5. You can decide at any time to exercise these rights and not answer any questions, or make any statements.'" (R. 186)
When asked by Sergeant Gaut if he understood his rights, appellant "responded that he did" (R. 186), although no written waiver was ever executed. Sergeant Gaut stated that appellant had not been offered any *Page 1050 
form of reward, nor had he been threatened or coerced, or induced. Moreover, it is not readily apparent from the record that Gaut even questioned appellant, although he had that intention, for appellant evidently initiated the conversation by an inquiry as to why he was being held and, upon receiving an answer, apparently quickly denied any complicity. We find that appellant had effectively waived his rights at the time he made the statement attributed to him by Sergeant Gaut. The fact that he subsequently chose to then exercise his rights does not act to prevent the State from introducing those statements made before that exercise, a principle implicit in the Miranda
decision itself: "[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." 384 U.S., at 474,86 S.Ct., at 1628 (Emphasis added). Cf., White v. State, Ala.Cr.App.,352 So.2d 29 (1977) (Statements made before accused decided to request attorney admissible). Eddy v. State, Ala.Cr.App.,352 So.2d 1161 (1977) (same).
Appellant further contends, however, that he could not effectively waive his Miranda rights because of his intoxication at the time of his questioning, basing this argument on the fact that he was arrested for public drunkenness, and therefore could not have had the requisite presence of mind to understand or waive his rights. The rule in regard to statements or confessions allegedly made by one under the influence of intoxicants has been often stated in decisions by this Court:
 "The law is well-settled that intoxication short of mania or such an impairment of the will or mind as to make a person confessing unconscious of the meaning of his words, will not render a confession inadmissible. The existence of intoxication which would effect the voluntariness of a confession is primarily a question of fact which is first addressed to the trial judge to determine the admissibility and later to the jury for whatever consideration it may deem appropriate."
Jackson v. State, Ala.Cr.App., 375 So.2d 558, 560 (1979); See,Mitchell v. State, Ala.Cr.App., 395 So.2d 124 (Ms. November 25, 1980); Tice v. State, Ala.Cr.App., 386 So.2d 1180, cert.denied, Ala., 386 So.2d 1187 (1980); Bufford v. State, Ala.Cr.App., 382 So.2d 1162, cert. denied, Ala., 382 So.2d 1175
(1980); Medders v. State, Ala.Cr.App., 342 So.2d 49 (1977). While we do not find that this particular issue was raised before the trial judge, it is evident from the undisputed testimony of Sergeant Gaut that, while appellant had obviously been drinking, he was not intoxicated in Gaut's opinion at the time he made the statement. The fact that appellant was arrested (apparently about an hour earlier) for public intoxication does not mitigate this as, under the above-stated rule, intoxication of a degree less than that of mania or mental insensibility will not act to render an otherwise voluntary statement involuntary. We do not find anything in the record to suggest that appellant was intoxicated to the degree contemplated by the authorities, and therefore the statement is not inadmissible on this ground.
Finally, appellant asserts that the statement should not have been introduced because it was either hearsay or an attack on his character when his character was not in issue. He bases his hearsay contention on the premise that his statement was not a confession and thus not within any exception to the hearsay rule. While it is obvious that appellant's conversation with Sergeant Gaut was by no means a confession, being totally exculpatory, it was nevertheless an admission by him and thus still not within the hearsay rule, as noted in 4 Wigmore onEvidence, § 1048 (Chabourne Rev. 1972):
 "But, regarded from the point of view of the legal rules of admissibility, the party's extrajudicial statements, like all other extrajudicial statements, are met and challenged by the hearsay rule . . . How is it, then (since they are nevertheless admissible against the party-opponent), that they are able to pass the gauntlet of the hearsay rule? Very simply. The answer is that the party's testimonial utterances do not pass the gauntlet of the hearsay rule when they are offered for him (unless they can satisfy some exception *Page 1051 
to that rule), but that they do pass the gauntlet when they are offered against him as opponent, because he himself is in that case the only one to invoke the hearsay rule and because he does not need to cross-examine himself . . . The hearsay rule, therefore, is not a ground of objection when an opponent's assertions are offered against him; in such case, his assertions are termed admissions. But the hearsay rule is a ground of objection by the first party when the opponent's assertions are offered in his favor, and such statements are then not termed `admissions' . . . It follows that the subject of an admission is not limited to facts against the party-opponent's interest at the time of making it. No doubt the weight of credit to be given to such statements is increased when the fact stated is against the person's interest at the time, but that circumstance has no bearing upon their admissibility." (Emphasis in original, footnotes omitted.)
We find the above principle embodied somewhat in the familiar rule that the acts and declarations of an accused, whether before or after the commission of an offense and whether or not a part of the res gestae, are admissible against that person, but only when such are part of the res gestae may they be admitted for the accused. Smoot v. State, Ala.Cr.App.,381 So.2d 668 (1980); Rogers v. State, Ala.Cr.App., 365 So.2d 322,cert. denied, Ala., 365 So.2d 334 (1978); Easley v. State,56 Ala. App. 102, 319 So.2d 721 (1975). There was no error in admitting the testimony concerning the statement.
 IV
Appellant next argues that the jury's verdict finding him to be guilty of murder in the first degree was against the great weight of the evidence in that appellant's evidence clearly indicated that he had stabbed Powell only in self-defense after Powell had assaulted him with "deadly weapons," i.e., the pool balls, and Powell's cohort, Tony Mickle, had attempted to prevent his escape. We have set forth the tendencies of the evidence in various portions of this opinion and will not repeat that here, concluding as we do that the State put forth a prima facie case of first degree murder. As to appellant's claim that he was acting in self-defense, we find the following from Graham v. State, Ala.Cr.App., 339 So.2d 110, cert. denied, Ala., 339 So.2d 114 (1976), to be helpful on this point:
 "Must the State disprove the defense of self-defense in order to convict a defendant of murder? While the burden of proving the defense of self-defense never shifts to the defendant, self-defense, like alibi testimony and all other conflicting evidence in a criminal prosecution is an issue to be determined by the jury. Our cases state the rule to be that if all the evidence raises in the minds of the jury a reasonable doubt as to whether the defendant acted in self-defense, the defendant should be acquitted. Lester v. State, 270 Ala. 631, 121 So.2d 110; Pounders v. State, 282 Ala. 551, 213 So.2d 394."
See Tucker v. State, Ala.Cr.App., 383 So.2d 579, cert. denied, Ala., 383 So.2d 586 (1980); Moore v. State, Ala.Cr.App.,364 So.2d 411, cert. denied, Ala., 364 So.2d 416 (1978); cases collected in Alabama Digest Homicide Key No. 276. The evidence here is unclear as to who initiated the difficulties between appellant and the deceased, Powell, but the jury could have concluded from the testimony that appellant started the conflict and advanced on the deceased. In any event, it is clear that the issue was one to be resolved by the jury, which evidently chose to disbelieve appellant's version of the incident.
 V
Finally, appellant has requested a "review of the entire transcript for any irregularities of the proceeding" (Brief of Appellant at 21). We have complied and reviewed the trial record and have found the same to be free of error.
The judgment of conviction is therefore
AFFIRMED.
All the Judges concur.
[1] A new City Code took effect in the City of Birmingham on January 1, 1980, and Section 11-6-12 of that Code defines "public intoxication" as appearing "in a public place under the influence of alcohol . . . to the degree that [one] endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity." As the offense in question here allegedly occurred before January 1, 1980, it is, of course, governed by the terms of the former section.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966). *Page 1052